Clark's Ferry Bridge Company, Appellant, *v.* Public Service Commission.

Argued September 27, 1932.

Before T<small>REXLER</small>, P. J., K<small>ELLER</small>, G<small>AWTHROP</small>, C<small>UNNINGHAM</small>, B<small>ALDRIGE</small>, S<small>TADTFELD</small> and P<small>ARKER</small>, JJ.

*George Ross Hull* of *Snyder, Miller, Hull & Hull,*

for appellant.—The finding of fair value made by the commission in a former proceeding is not res judicata: Scranton v. Public Service Commission, 80 Pa. Superior Ct. 549; Knoxville v. Knoxville Water Co., 212 U. S. 1; Terminal R. R. Assn. v. U. S., 266 U. S. 17.

*E. Everett Mather, Jr.,* Assistant Counsel, and with him *John Fox Weiss,* Counsel, for appellee, cited: New York & Pennsylvania Company v. New York Central Railroad Company, 267 Pa. 64; New Street Bridge Company v. Public Service Commission, 271 Pa. 18; City of Philadelphia v. Public Service Commission, 84 Pa. Superior Ct. 135; City of Erie v. Public Service Commission, 103 Pa. Superior Ct. 59.

PER CURIAM, March 17, 1933:

Clark's Ferry Bridge Company, the appellant herein, was the respondent in a certain inquiry and investigation instituted against it by The Public Service Commission of the Commonwealth of Pennsylvania, upon its own motion, on January 14, 1930.

The subject matter of the investigation was the reasonableness of the toll rates appellant was then charging for passage over its concrete bridge spanning the Susquehanna River, from southeast to northwest, at a point about fourteen miles north of Harrisburg and several hundred yards north of the confluence of the Juniata and Susquehanna Rivers. The rates challenged were those fixed by appellant in its tariff P. S. C. Pa. No. 4, effective July 1, 1929; included therein was a rate of ten cents for an ordinary passenger automobile. During the progress of the inquiry, appellant filed a new tariff, P. S. C. Pa. No. 5, effective November 14, 1930, in which it reduced the rates on the higher classifications of motor buses and trucks from sixty cents to thirty-five and fifty cents respectively, but retained the ten-cent rate for automobiles.

The investigation terminated on February 2, 1932, in a report and order by the commission, finding that the rates contained in the then existing tariff P. S. C. Pa. 5 "are unreasonable, and will be for the future, and that a tariff should be filed calculated to produce a revenue of $84,125 per year." Appellant was accordingly ordered to file, post, and publish, a tariff containing the following "tentative rates": (1) A rate of eight cents cash toll for all ordinary passenger automobiles and wagons theretofore paying ten cents; (2) a ticket, without time limit, salable at the rate of two for fifteen cents for all such automobiles and wagons; (3) a twenty-trip ticket, non-transferable as between vehicles, good any time within thirty days from date of issue and salable for one dollar for all such automobiles and wagons; and (4) for all other types of vehicles the rates to remain as provided in tariff P. S. C. Pa. No. 5.

The appeal now before us was taken by the bridge company from the above finding and order of the commission.

As this was the third proceeding in which the rates of appellant have been under investigation before the commission—the first having been conducted in 1926, and the second in 1929—and as there is a close relation between the result of the proceedings in 1926 and the present inquiry, reference to the previous investigations is necessary. The bridge is comparatively new, having been completed May 30, 1925, under a contract awarded June 10, 1924. Appellant's tariff P. S. C. Pa. No. 2 became effective May 30, 1925, and contained a rate of twenty-five cents for automobiles of more than two passenger capacity. The new bridge was constructed near the site of, and to replace, a covered wooden bridge, acquired April 7, 1915, at a public auction in Philadelphia, in behalf of four individuals who incorporated the present Clark's Ferry Bridge Company. By 1924, the increase in the volume

and weight of traffic rendered the wooden bridge obsolete and appellant constructed the new bridge, consisting of fifteen concrete arches, open spandrel type of construction, with twenty-foot wide clear roadway and a four-foot wide sidewalk on the upstream side. It has a total length of 2,075 feet, face to face of abutments, and an extended approach at each end, and is located about fifty-four feet (center to center) downstream from the old bridge.

The twenty-five-cent rate included in tariff P. S. C. Pa. No. 2 had been in effect since 1915. On August 11, 1925, George A. Herring et al., filed a complaint (Complaint Docket 6611) alleging that the rates then in effect were unreasonable. Hearings were conducted by the commission upon this complaint for the purpose of enabling it to determine the then fair value of appellant's property for rate making purposes. This proceeding resulted in a report and order, dated June 8, 1926, in which the commission found that the fair value of the property, as of that date, was $767,800, and that appellant was entitled to receive, for the use of its property devoted to the public service, a gross annual revenue of $85,905, thus ascertained:

| | |
|---|---:|
| 7% Return on $767,800 | $53,746 |
| Annual operating expenses and taxes | 23,150 |
| Annual depreciation allowance | 7,678 |
| Amortization of bond discount | 1,331 |
| Total allowable gross revenue | $85,905 |

As the rates in tariff No. 2 were producing a gross revenue in excess of the above amount, the commission determined that the rates then in effect were unreasonable, and ordered appellant to file a new tariff to become effective July 1, 1926, containing rates designed to yield an annual gross revenue not in excess of $85,905; it also expressed the opinion that the public interest demanded that the rate for private automo-

biles, regardless of seating capacity, should not exceed fifteen cents.

From this report and order appellant appealed to this court on June 22, 1926, and gave bond, in accordance with section 19 of Art. VI of the Public Service Company Law of July 26, 1913, P. L. 1374, conditioned for the repayment, to all parties aggrieved, of any excess above the rate fixed by the commission, in the event that the order of the commission should be finally affirmed. This appeal was argued before us, at Philadelphia, in November, 1926, and a reargument was directed to be had, at Harrisburg, in March, 1927, "with special reference to depreciation." Before the time fixed for the reargument, appellant, by reason of increased traffic, decided to withdraw the pending appeal. Accordingly, on February 26, 1927, it filed a new tariff, P. S. C. Pa. No. 3, retroactive to July 1, 1926, (the date specified by the commission in the order appealed from), in which a fifteen-cent rate for automobiles, with a seating capacity of seven or less, was included.

During the period between July 1, 1926, and February 26, 1927, appellant gave persons crossing its bridge in motor vehicles receipts for the excess tolls collected during that period. It is stated by the commission, in the course of its report in the present proceeding, that the receipts issued aggregated $32,821, but the total of those presented for redemption was only $8,510, leaving a difference of $24,311 of excess tolls in the treasury of appellant.

The next complaint was filed by the Commercial and Industrial League of Harrisburg on April 22, 1929, at Complaint Docket No. 8002. This complaint was inartificially drawn and was directed rather against certain alleged violations by appellant of the order of June 8, 1926, than against the rates, nor did the evidence offered in support of the complaint furnish a sufficient basis for the determination of a reasonable rate.

During the pendency of this second complaint, appellant on June 1, 1929, filed a new tariff, P. S. C. Pa. No. 4, effective July 1, 1929, in which it reduced the rate for ordinary passenger automobiles to ten cents; this was the tariff in effect on January 14, 1930, the date upon which the commission made its interim report on the complaint of the Commercial and Industrial League and instituted the present inquiry, upon its own motion, at Complaint Docket No. 8219.

Appellant filed its answer to the commission's complaint and averred therein that its rates were fair, just and reasonable.

Hearings were conducted before the commission between March 12, 1930, and February 26, 1931. In support of its complaint, the commission offered its report and order in the prior proceeding of 1926, the annual reports of appellant for 1926, 1927, and 1928, and through James E. Keane, one of its accountants, a report of an examination of appellant's books and records, designated as "Complainant's Exhibit No. 1." Appellant, through James W. White and Paul B. Johnson, of the American Appraisal Company, placed in evidence a reproduction cost estimate of its property, dated September 1, 1929, and identified as "Respondent's Exhibit No. 1;" this was followed by the placing in evidence by the commission of a similar estimate, prepared by Lynn B. Curry, one of its engineers, referred to as "Complainant's Exhibit No. 3."

From a comparison and analysis of these estimates, we may readily ascertain the differences between the parties. Appellant's contention was that the then fair value of its property for rate making purposes was $1,029,297, as shown by its reproduction cost estimate, less accrued depreciation. The estimate of the commission's engineer of the reproduction cost of appellant's property, less the accrued depreciation thereon, was $741,871. The commission determined that the fair value for rate making purposes, as of February 2,

1932, was still $767,800, and fixed the allowable annual gross revenue as follows:

"Fair return [7% on $767,800] ......... $53,746
Annual expenses ..................... 22,700
Annual depreciation ................... 7,678

Total .......................... $84,124"

Appellant contended the rate of return should be nine per cent and that the annual allowable gross revenue should be thus ascertained:

Fair return [9% on $1,029,297] ........ $92,636
Operating expenses ................. 34,928
Annual depreciation .................. 21,210

Total .......................... $148,774

Each estimate of reproduction cost was set up under the same general divisions and headings. Under the general division, "Tangible Costs," there are two subdivisions: (a) "Direct Construction Costs," and (b) "Indirect Construction Costs"; under the former are listed the respective appraisements of the physical property of appellant, divided into appropriate classifications and with twenty numbered items under the classification, "Bridge Structure." Under the heading, "Indirect Construction Costs," items for "Engineering and Supervision," "Administrative, Legal and Incidental," expenses are listed, as well as one for "Interest During Construction." The engineers of appellant included under the general division, "Intangible Costs," the following items: "Promotion and Preliminary Organization," "Organization and Incorporation," "Cost of Financing," and "Interest on Intangibles," together with an estimated amount under each heading; the engineer for the commission grouped "Promotion and Preliminary Organization" and "Organization and Incorporation" together, including a single amount for these items, and did not include

anything for "Interest on Intangibles." From each estimate an amount is deducted for "Accrued Depreciation." The engineer for the commission, however, deducted more than two and one-half times as much for this item as did the engineers for appellant. There are two other items, aggregating $157,000, included in appellant's estimate but entirely excluded by the engineer for the commission; these items are $57,000 for "Attached Business Value" and $100,000 for "Value of Location." Appellant's total estimate of reproduction cost, less accrued depreciation, is $1,032,644, but it conceded that $3,347, included for certain freight items, should be deducted, thereby making its final estimate $1,029,297, as hereinbefore stated.

With this general description of the respective contentions of the parties and of the scope and character of the evidence in mind, we are prepared to consider the contention of the able and experienced counsel for appellant that the commission treated its findings in the investigation of 1926 as res judicata of the issues arising under the present complaint and answer. It is true that the commission fixed the fair value of appellant's property, as of the date of the order now appealed from (February 2, 1932), at the same amount as that arrived at in 1926, and it is also true that the allowable gross annual revenue now prescribed is slightly lower than that allowed in the previous proceeding.

We, however, do not understand the report of the commission in this proceeding to mean that it treated its findings in 1926 as necessarily conclusive upon the issues raised by appellant in the present inquiry. Counsel for appellant point to a sentence in the present report in which the commission, after referring to its report and order in 1926 and to the fact that the appeal taken by appellant from that order operated as a supersedeas until the withdrawal of the appeal on March 1, 1927, say, "The commission's finding of

value thereupon [i. e. when the appeal was withdrawn] became conclusive upon the company and tariff No. 3 was filed, prescribing, among others, a fifteen-cent rate for ordinary passenger automobiles and commonly known as the fifteen-cent tariff.'' That statement obviously refers to the effect of the withdrawal by appellant of its appeal from the order of June 8, 1926, and the filing of the tariff therein prescribed; it correctly describes the situation as it existed immediately after the withdrawal of the appeal. When the subsequent complaints were filed, the commission evidently did not consider its previous findings as barring appellant from raising the question of the fair value of its property in 1930 and the proper allowances to be made for operating expenses and depreciation, but instituted an investigation, and, as already stated, admitted in evidence appellant's reproduction cost estimate and its supporting testimony, and put in evidence the reproduction cost estimate of one of its engineering staff, and the report of the result of an examination of appellant's books and records.

Because of the comparatively recent construction of the bridge, evidence of its actual cost was readily available at both inquiries. The evidence in each proceeding showed the bridge was built under a contract awarded after competitive bidding. Appellant contended, and showed, the contractor lost money, but the commission replied the loss was due to unusual flood conditions in September, 1924, which entailed a loss to the contractor through delay and destruction of equipment.

Referring to the difference in the character of the evidence introduced at the respective hearings, the commission said, ''A significant factor in the present consideration is that all the new material submitted in this proceeding is a matter of judgment and estimate on the part of appraisal engineers, whereas the

finding in 1926 was made almost in its entirety upon actual cost figures as shown by the books of the company and sustained by the testimony of the engineer in charge of the bridge construction. In the absence of evidence that these figures were either abnormal at that time or have become obsolete by reason of changes in price levels or construction conditions, they should carry a very material weight in forming a decision as to the reproduction cost and value of this property at the present time. ...... While the technical burden of proof is not upon it, it would seem that the company in attempting to satisfy the commission that the prior actual cost of the bridge and the findings of the commission as of that time are materially lower than the present value of the bridge, has a substantial burden upon it to satisfy that tribunal of the merit of its contentions.''

In stating its conclusion as to fair value the commission said, ''As has already been noted the valuation of the property in 1926 was made chiefly on actual cost figures adequately supported by testimony of engineers. The present claim of increased value is based on non-competitive estimates of appraisers whose business it is to make such estimates. In the face of their figures the evidence is that construction costs and methods have not increased in the interval. Any necessity of reconciling their estimate with the actual prior figures is disclaimed by these witnesses. In the interval since the prior valuation, the commission could not assume, without investigation, that capital investment and operating cost had not changed so as to affect the level of reasonable rates. We have now made such a study of the property. Having made a complete valuation of this property in 1926 and having ascertained that cost conditions have not changed materially since that time, the commission is of the opinion that it is not required to reopen the entire question of valuation

merely because the company concerned desires it. Nor is there anything in the evidence adduced which is persuasive that in this particular case justice requires a reopening of the prior valuation. Upon a complete examination of the entire record in both proceedings, the commission is of the opinion and finds that the fair value of the property of the Clark's Ferry Bridge Company is still $767,800 as of this time."

In our opinion, these excerpts from the report of the commission demonstrate it took the position in the present proceeding that, although the technical burden of proof was not upon appellant, yet, in view of the history of the 1926 inquiry, appellant did have the burden of supporting its contention that conditions had so changed between 1926 and 1931 that its present reproduction cost estimate was a better index of fair value than was proof of the actual original cost of its property. As its reproduction estimate was approximately 35% higher than original cost, appellant had a rather heavy burden, but was afforded every opportunity to support its contention by evidence.

The evidence shows that in 1924, when the contract for the construction of the bridge was awarded, construction prices were reported as being 215% of the 1913 level; that in September, 1929, when appellant's reproduction cost estimate was made, they were 208% of the 1913 level; and that during the last three months of 1930 they fell to about 198%. In brief, we have this situation. The commission made a finding of value in June, 1926, from which appellant appealed but subsequently abandoned its appeal; the finding thereupon became conclusive for a reasonable period of time. Probably no general rule could be formulated with relation to just when it may become the duty of the commission to make a new valuation of the property of a utility. Under such precedents as, City of Phila., v. Public Ser. Com. 83 Pa. Superior Ct. 8; same v.

same, 84 Pa. Superior Ct. 135; Kittanning Tel. Co., v. Pub. Ser. Com. 78 Pa. Superior Ct. 436; City of Erie v. Pub. Ser. Com., 103 Pa. Superior Ct. 59; and New Street Bridge Co., v. Pub. Ser. Com. 271 Pa. 19, it may be said that when conditions have changed materially, or price levels have fallen or risen to a marked degree, since a prior investigation, the commission should again go into the question of value. The important question here was whether appellant's evidence showed such changes in conditions or price levels as to make it the duty of the commission to re-value the property.

In arguing that the commission ignored the settled proposition of law that a public service company is entitled to earn a fair return upon the present fair value of its property, regardless of what the original cost of that property may have been, counsel for appellant say in their brief that the "difference [for which they contend] does not arise out of a change in price levels; but from the fact that the company at the time of the construction of the bridge obtained its property for less than cost, or fair value." The same contention was made in the former proceeding; the burden of appellant's present complaint seems to be, not that conditions or price levels have so changed as to require a new valuation, but that the original valuation by the commission was too low. This argument seems to ignore the legal effect of the withdrawal by appellant of its appeal from that valuation.

Having reached the conclusion that appellant's evidence did not show such changes in conditions or price levels as would entitle it to have the previous adjudication of fair value opened and revised, there was no occasion for the commission to make specific findings as to the reproduction cost of the items of physical property concerning which the engineers disagreed, or with reference to controverted overheads and intan-

gible costs. It did, however, discuss these items in its report and indicate its reasons for holding that appellant's evidence relative thereto did not justify opening the prior finding. The commission also stated the factors considered by it in fixing its present allowances for operating expenses (including federal income taxes) and for annual depreciation, together with its reasons for rejecting appellant's contentions with respect to these annual allowances.

In compliance with the legislative mandate of the amendment of June 12, 1931, P. L. 530, that, in an appeal of this character, we shall consider the record and "on [our] own independent judgment ...... determine whether or not the findings made and the valuation and rates fixed by the commission are reasonable and proper," we have examined into the main controversies between the parties.

The first question demanding consideration, relates to the respective estimates of the reproduction cost, new, of the physical property, which estimates are set out in each exhibit under the heading "Direct Construction Costs." The total of these costs as contended for by the engineers of appellant, is $718,504, and the amount conceded by the engineer for the commission is $664,774.

An inspection of the estimates discloses substantial agreement as to approximately three hundred thousand dollars' worth of physical property and that the difference of $53,730 in the totals is due to material differences in four of the twenty-eight items arranged under the heading, "Direct Construction Costs."

Three of the items referred to are sub-divisions under "Bridge Structure"; the fourth is entitled "Earth Fill," and relates to the fills of the old bridge which were held to be useful in the new structure.

The character of the items and the estimates of the respective engineers may be thus indicated:

| Item. | Appellant's Engineers. | Commission's Engineer. |
|---|---|---|
| 10. 1:2:4 Concrete Arch Rings, Walls, etc. | $267,312 | $246,896 |
| 17. Reinforcing Steel Bars in Concrete | 68,778 | 49,667 |
| 20. Coffer-Dams | 51,681 | 42,000 |
| Earth Fill | 16,800 | 12,000 |
| Totals | 404,571 | 350,563 |

The amount of concrete involved in Item 10 (the largest single item in the inventory) was 9,496 cubic yards and the difference in the estimates $20,416; appellant's engineers used a unit price of $28.15 and the commission's engineer $26.

An analysis of the testimony indicates that appellant's engineers included an item of $2 for "labor for building forms," but the commission's engineer made no separate allowance for this item. Our independent judgment is that the evidence indicates $26 as a proper and reasonable unit price to be used in making a reproduction cost estimate on this item. The bid of the contractor who built the bridge was $24 per cubic yard.

Under Item 17, the number of pounds of reinforcing steel bars used was 1,079,718; appellant's engineers used a unit price of .0637 cents and the commission's engineer .046 cents, resulting in a difference of $19,111. Expressed in tons, the unit prices are $127.16 and $91.47.

Appellant concedes that its unit price should be reduced to .0606 by deducting estimated freight charges, above mentioned, aggregating $3,347. We are not convinced that the estimate of the commission's engineer is unreasonably low on this item.

Item 20, coffer-dams, in which there is a difference of $9,681, involves problems upon which it is difficult

to arrive at satisfactory conclusions. As to the tangible costs under this item, the engineers agree they should be estimated at approximately $26,500, but they disagree materially about the indirect charges and overheads. The commission's engineer stated that "the item of coffer-dams and taking care of the water ...... is the most indefinite one to detail in the whole valuation." Our judgment is that his estimate on this item should be increased to $50,000.

As the present bridge is downstream from the site of the former, it was possible for appellant to use, as a protection to the new structure, the two abutments, retaining walls and approach fills, which formed parts of the old one. The difference here relates to the approach fills, containing 8,000 cubic yards, and amounts to $4,800.

With reference to this subject the commission said in its report: "The engineer has included both the old fills and the new fills constructed when the new bridge was built in 1924 and 1925 at the same unit costs. Although this unit cost is conceded to be unusual and higher than was estimated when the bridge was built, there is substantial evidence that it is not an improbable cost for such work in this vicinity. The lower cost adopted by the commission's engineer for the old fill alone is based, however, upon the fact that it is an old fill adapted to its present uses and is not intended to be a cost of placing new fill. The commission is of the opinion that if the fill is to be regarded in its entirety as used and useful property, it should be included at a price reflecting its second hand nature, as was done in the prior proceeding."

We do not disagree with these conclusions relative to this item. The company's engineer, at the first hearing, fixed the value of the old fill at $12,000, the figure used by the commission's engineer.

The net result of our conclusions from the evidence

introduced for the purpose of showing the direct reproduction cost, new, of appellant's physical property is that the estimate of the commission's engineer should be increased $8,000 on Item 20. In our opinion, the total of "Direct Construction Costs" should be fixed at $672,774.

The direct reproduction cost of the physical property of a public utility is, however, only one step in the ascertainment of its total depreciated reproduction cost, and that cost is merely one of the indices of fair value.

Therefore, our conclusions with respect to the direct cost of reproducing appellant's physical property can have but slight bearing upon the main question, whether the evidence, as a whole, made it the duty of the commission to reopen its former valuation.

The soundness of the commission's position is best seen when we compare the indirect construction and intangible costs claimed by the company's engineers as entering into the reproduction value of the bridge in September 1929 with the corresponding costs actually expended by the company in its erection in 1924-5. As has already been pointed out the commission's duty was to fix the fair value of the bridge at or about the time it made its order, on which a fair and reasonable return to the company could be calculated, which in connection with operating expenses and annual depreciation would represent the gross return which the company was entitled to receive from the public by way of tolls. Our Public Service Company Law requires the commission, in ascertaining and determining the fair value of a public service company's property, to take into consideration, inter alia, the original cost of construction, particularly with reference to the amount expended in the existing and useful permanent improvements, and the reproduction costs of the property based upon the fair average price of materials,

property and labor (Art. V, Sec. 20); and the Supreme Court of the United States has ruled that the present reproduction cost, less depreciation, must be considered in arriving at fair value; although it does not have to be accepted as the measure of such value: Georgia Ry. & Power Co. v. Railroad Commission, 262 U. S. 625; City of Phila., v. P. S. C., 84 Pa. Superior Ct. 135, 150. The peculiar circumstances of this case, however, bring it more nearly within the pronouncement of the Supreme Court of the United States in McCardle v. Indianapolis Water Co., 272 U. S. 400, that "the reasonable cost of a [public utility], well planned and efficient for the public service [in that case a waterworks system] is good evidence of its value at the time of construction. And such actual cost will continue fairly well to measure the amount to be attributed to the physical elements of the property so long as there is no change in the level of applicable prices" (p. 411).

The utility property under consideration in this case is not a complicated system which has taken years to construct and enlarge, like a water works, or gas works, or electric light plant, or street railway system. It is one structure, a reinforced concrete bridge, built as it now is, without additions or improvements. It took a year to build it and it was completed in May, 1925, only six years before the commission's engineer made his reconstruction estimates. The wooden bridge which it replaced was not abandoned or discontinued until the new bridge was completed. We have a right to consider the history of the bridge and the facts in connection with its construction in passing on the fair value of the property. As we have already stated, the trend in prices has been downward rather than upward from 1924-5, when the bridge was built, to 1931-2, when the commission determined its present fair value. Certainly, in the absence of proof that the

prices paid for the construction of the bridge were abnormally low there is no reason why in the short period of six years after its completion, with the tendency of prices for both material and labor being downward, there should be a radical increase in the fair value of the bridge for rate-making purposes. We have already examined the tangible costs of a reconstruction estimate with the results above mentioned. As to the intangible costs the commission in making up its determination of fair value used the following figures submitted by the company as their actual cost, viz., engineering $39,272, miscellaneous $4,271, interest paid during construction $20,912, but instead of cost of financing claimed, $74,523, allowed $37,523, as the real cost of financing, and also allowed $27,000 bond discount to be amortized out of earnings over the life of the bonds, fifteen years, making an annual allowance of $1331, but disallowed $10,000 claimed as cost of financing the preferred stock. The commission also allowed incorporation expense of $819 actually paid, and $21,950 expense for removing piers of the old bridge from the bed of the river. These piers have only recently been removed.

The company's engineers, at the hearing, proceeding as if it were an entirely new proposition, without a history, estimated the following "Intangible Costs":

| | | |
|---|---:|---:|
| Promotion and preliminary | $10,125 | |
| Organization and incorporation | 10,125 | |
| Financing | 58,090 | |
| Interest on intangibles | 3,980 | 82,320 |

and in addition estimated the following "Indirect Construction Costs":

| | |
|---|---:|
| Engineering and supervision | $43,027 |

| | | |
|---|---:|---:|
| Administrative, legal and incidental | 9,930 | |
| Interest during construction | 38,145 | 91,102 |

making a total of $173,422
for what the commission had allowed,
based on actual expenditures, $129,797

With these figures may be compared those prepared by the engineer of the commission in estimating theoretically the reproduction cost new of the bridge, which were considered, but not adopted, by the commission:

| | |
|---|---:|
| Engineering | $43,000 |
| Promotion and organization | 8,000 |
| Administrative, legal and general exp. | 8,000 |
| Interest during construction | 22,000 |
| Cost of financing | 37,500 |
| | |
| Total | $118,500 |

We are of opinion that the actual expenditures made by the company for these intangible or indirect construction costs when the bridge was built six years before, more nearly represent their real value than the estimated percentages calculated by engineers living at a distance and based on a theoretical construction by a new corporation without any history or background: Wabash Valley Elec. Co. v. Young et al., 287 U. S. 488. We are of opinion, however, that as bond discount of $27,000 was actually paid by the company it is entitled to its annual amortization allowance of $1331 for the life of the bonds, even though the bond issue has since been refunded and reduced to $269,500.

As before stated, the company contended that the actual cost of constructing the bridge did not represent its value because the contractor lost money on

the job, and therefore that it obtained the bridge for less than its fair value. The company is entitled to have its schedule of rates based on the fair value of the bridge and if that value is greater than the amount paid the contractor, it is entitled to a fair return on the excess over actual cost. But the fact that the contractor lost money on the job is not proof that the value of the bridge exceeded the amount paid the contractor by the amount of his loss, which was calculated as follows:

| | |
|---|---:|
| Loss on labor and materials | $ 61,140 |
| Overhead, depreciation and plant charge | 82,000 |
| Fair profit to contractor | 70,000 |
| | $213,140 |

On the contrary, as pointed out by the commission in its first report, when the same claim was made, the loss may have been due to bad judgment on the part of the contractor. A sudden rise in the Susquehanna River during the course of the work was responsible for the loss; without it there would have been a fair profit. Twenty thousand dollars additional spent on the coffer-dam construction above the $30,000 spent by the contractor would probably have obviated the loss. Hence the utmost that the company could ask to be added to the contractor's figures would be, not the loss to the structure and the contractor's equipment and profits caused by the flood, but the cost of the enlarged coffer-dam construction which would have prevented the loss. We have increased the coffer-dam expense to cover this amount.

The fair value of the reconstructed house which is used for living quarters of the superintendent and incidentally as an office, is to be measured by its fair market value, not by its reconstruction cost. It is a dwelling house, brick and stucco, with no special

features distinguishing it from an ordinary dwelling. It differs from a distinctive utility structure, that has no other use or purpose. The fair market value in our opinion, — especially in view of the decline in real estate values,—is better measured by the value fixed by the commission than by the reconstruction cost figures of the company's engineers.

As stated, the company presented two large items of alleged "fair value" which the commission disallowed in toto:

"Attached business value $ 57,000
Value of location 100,000"

The explanation of the item "attached business value" as given in the company's engineers' report is "If another bridge should be constructed beginning at the date of this appraisal sixteen months would elapse before such bridge could begin to earn. The existing bridge during that period, if limited to 8 per cent. return per annum on the cost of reproduction, would have earned $95,138, or if the return were fixed at 8 per cent. on the cost of reproduction and other values here mentioned, the earnings would exceed $110,000. If these amounts are lessened by the amount of interest during construction, $38,145, as allowed in the physical plant, the indicated advantage to the owners of this bridge over a bridge on which construction was just starting would be $57,000 to $72,000."

Counsel for the commission very properly say on this item: "This item ...... is actually a claim that in reconstructing this property it [the company] should be allowed a return on the entire property during the period before it is constructed and before the company's money is invested. All utility valuations make allowance to the company for the interest during the construction period on the money which has to be raised for the work before the property is completed and is put into use. Appellant made such a claim here

under the name of interest during construction. In the item of value which is entitled 'Attached Business Value,' however, it claims in addition to this sum the difference between the allowance for interest during construction and the total amount which the company would have earned had it already been engaged in the service of the public through all this period. By adding this attached business value to its interest during construction appellant is in effect claiming not only that it should be given a fair return on its property from the time it begins to serve the public but that it should be given a full fair return on all its prospective property from the moment it determines to build it and to enter the public service. Clearly, the public service should allow the company to capitalize its interests on its actual investment prior to the entrance into public service; but it may not capitalize its hopes of a fair return before it has actually begun the service of the public." We may add that in the history of this company it appears that the traffic was taken care of by the old bridge all during the construction of the new one, and the income therefrom paid to the company, and no sufficient reason appears why the public should in addition pay for the future an annual return on the money so received as part of the capital structure or fair value of the bridge.

In support of the item, "value of location," the company's engineers' report claims $100,000 as representing the estimated value that the present location of the bridge has over any other point for miles in either direction by reason of the river being narrower there, the river bed conditions favorable and neither bank occupied by railroad rights of way.

To this the commission replied: "The original choice of the bridge site was not made by the entrepreneurs of this company, but by the Commonwealth and the company has merely taken advantage of traf-

fic customs which the Commonwealth, through its system of highways and otherwise, has created. As in the previous consideration of this claim the commission is of the opinion that such a claim of value must be rejected for rate-making purposes," and counsel for the commission pertinently says: "This contention of appellant fails to recognize the fundamental principle of public utility regulation which is to prevent a fortunately situated utility from taking advantage of its location and the public necessity for its service in order to compel the public to pay the price which it chooses to demand...... This claim of appellant ignores the fact that the right to operate a toll bridge across the river here or elsewhere is fundamentally the gift of the Commonwealth, contained in appellant's franchise, and to attach a value to it would be to capitalize the franchise contrary to the provisions of the statute and the frequent decisions of the courts. Moreover, as has been stated, appellant's incorporators did not exercise any foresight other than that which could be expected of any prudent man when they chose this location for the building of their new bridge. The prior history of the site would have made the choice of any other location an obviously foolish move. Certainly had such a choice caused the expenditure of an additional $150,000 to $200,000 as appellant's appraisers suggest it would, the additional money and possibly almost the entire investment at that location would have been regarded as an imprudent investment upon which the company would have no legal right to expect the public to produce a fair return. Appellant has merely done the thing which was most obvious and has taken advantage of traffic customs which had already been established for it and it should not be allowed to capitalize them in order to demand an increased rate from the traveling public. By the evidence of its own witnesses appellant's real estate

does not have a market value of the $100,000 or more which it claims."

The appellant and appellee differ greatly on the allowance for depreciation, both as to the accrued depreciation which is to be deducted from the cost of reproduction and the yearly allowance to be made in order to restore the structure when worn out. Appellant claims that in the commission's figures the former is too great and the latter too small. Its engineers allow an accrued depreciation for the four and a half years elapsing to the time of their survey of $16,282, but claim a *yearly* depreciation allowance thereafter of $21,210. That is, the reproduction cost new is depreciated only $16,282 during the first four and a half years, but the company is entitled to $31,-815 allowance for depreciation during the year and a half elapsing before the commission's engineer made his examination. The commission's engineer fixed the accrued depreciation for six years at $41,403, and the annual depreciation allowance at $6,242. The commission without fixing any specific figure for accrued depreciation, definitely refused to accept the figures of the company either for "observed depreciation" or annual depreciation; it adopted as the fair value of the bridge on the last hearing the same figures fixed by it on the first hearing, $767,800. This figure can be sustained by making a fair allowance for accrued depreciation. For annual depreciation it allowed $7,678 per year, as in its first report. We said in Scranton-Spring Brook Water Co. v. P. S. C., 105 Pa. Superior Ct. 203, 225, that the allowance for annual depreciation should bear some fair relation to the accrued depreciation. We do not mean to say that they should be calculated on the same basis, for the accrued depreciation represents the actual depreciation which has occurred and which may be discovered by inspection and examination, while the annual depreciation

allowance is a theoretical allowance made from year to year, which, with the accretions from interest on investment, is calculated to replace the structure when worn out; but there should be some reasonable relation between them, at least in a structure, like this, which is subject to gradual but continuous disintegration from the moment of its completion, rather than to sudden change and decay. The inspection and examination of a structure which is undergoing gradual but constant change and disintegration should not be merely an outward or superficial observation, but should take into consideration the internal changes which engineers agree are taking place in such a structure. Such an examination is to be preferred to mere calculations based on averages and assumed probabilities: McCardle v. Indianapolis Water Co., 272 U. S. 398, 416. Mr. Jacobs, one of the company's engineers, who testified on March 12, 1930, as to the annual depreciation allowance, described very clearly the chemical action that takes place in concrete when reinforced by steel, as follows: ''The general cause of depreciation of reinforced concrete is the action of water on the reinforcing steel, corrosion of steel set up and stress, or a chemical corrosion, which seems to eat the concrete away which is covering the steel, and you can notice it if you will inspect this bridge carefully. You will notice if you were just even to drive across slowly, you will see brown spots forming on the bridge, and those brown spots are evidence of corrosion of the steel. That is iron oxide, the brown spots, where that takes place, and that action will tend to erode or wear away the concrete. That is the principal cause of depreciation...... Ferrous oxide and ferric oxide are both spongy and light in specific gravity. They expand thus forcing and breaking away the concrete. You can find evidence of it by what 'we call fine, hard cracks in the concrete...... It has very much the

same effect as freezing, that is the expanding of the water, which forms ice in changing its volume." Mr. Jacobs testified that the life of a concrete bridge of this type was from forty to eighty years. Mr. White, another of the company's engineers, who furnished the figure as to "observed depreciation," gave its life from fifty to one hundred years. We were not impressed by his testimony as to how he arrived at a figure of $16,282. He explained, "My opinion was based upon the relative desirability of this bridge and its accessories as compared to a bridge that is built, irrespective of the age of the bridge"— whatever that may mean. And again, "The item $16,282 is in reality determined by a percentage of the total value; it was determined without giving recognition to the various defects, and other conditions of the property as observed, and that the amount relatively would be equivalent to about a two per cent. deduction on the total value of the property; there being some slight cracking in parts of the bridge; there being some excess in the old parts of the bridge properties retained [that is, the fills and wing walls retained from the original bridge] that would not be exactly as reconstructed at the present time; there being some buildings that had some aging and some defects visible." He did not take into consideration the visible signs of chemical action or corrosion which Mr. Jacobs said could be discovered. His examination was admittedly only cursory and rather a surface observation than an inspection and examination.

Mr. Curry, the commission's engineer, in his examination made in May, 1931, six years after the completion of the bridge, inspected the brown spots in the concrete, the cracks in the structure, found places where the steel was exposed to view, and concluded that the actual depreciation was in line with the calculated depreciation at the end of six years under the

4% sinking fund method of calculating depreciation, on a life of forty-five years, and fixed the accrued depreciation then at $41,403. We are of opinion that the latter figure is nearer the actual accrued depreciation than the estimate of the company. Certainly no harm is done the company by fixing the fair value at $767,800, the extra allowance, over the contractor's bid, for concrete and coffer-dams being applied against accrued depreciation, especially when it is considered that of the fair value thus fixed, $21,590, allowed for expenses of removing the old piers, was not expended until subsequent to the last hearing. That amount and the seven per cent. return which the company has received upon it for all these years, will more than compensate for any minor under-allowance in value.

In figuring annual depreciation allowance the company claimed an allowance of 2½% annually on the straight line method, allowing the bridge a life of forty years. Mr. Curry, the commission engineer, figured the allowance by the 4% sinking fund method, in which annual payments are made which with interest at 4%, compounded, will build a new bridge at the end of forty-five years, taken as the calculated life of the structure; although he said the bridge had a possible useful life of eighty years.

The commission adopted neither method. It allowed $7,678 annually. This sum set aside each year, with 4% *simple* interest will in fifty years produce approximately $767,800, sufficient to rebuild the bridge as now valued. The straight line method advocated by the company will in fifty years with 4% simple interest produce a fund twice as great as that necessary to replace the bridge. The straight line method is often used for short-lived structures, or plants of a character that they can be restored from time to time to the original condition of efficiency. It is also used in calculating the federal income tax because in so doing

the company charges itself with the annual interest received from the depreciation fund, which may not be done here: City of York v. P. S. C., 85 Pa. Superior Ct. 139. It is not so fair or equitable when applied to a long-lived structure or one that is disintegrating gradually and continuously and not capable of being restored to its original condition. The company may not be required to apply the income received from the depreciation fund to make up any deficit of operation (Board of Public Utility Commissioners v. New York Telephone Co., 271 U. S. 23), but it is not entitled to an allowance, which exclusive of interest earned on the fund, will be sufficient to rebuild the bridge, when its life is done, but only to such an allowance as will with reasonable interest added make a fund sufficient to replace the bridge when it requires replacement. We think the amount allowed by the commission is fair and reasonable in the circumstances. Moreover, the commission included in its allowance for operating expenses an item of $1,800 for "maintenance."

The company claimed a return of 9% per annum on the fair value, because it alleged the bridge was subject to special danger from ice floods and freshets. The commission allowed 7%, plus the federal income tax, and a yearly allowance of $1,700 to cover freshet and flood insurance. We agree that this is fair and reasonable. The company cannot reasonably ask a payment of over $10,000 yearly to cover a risk against which it may be adequately protected by an allowed expenditure of $1,700.

Of the objections to operating expenses as allowed by the commission we shall refer to only two.

Salaries were fixed at $2,400, as in the first report. The company had been paying $4,800 but increased the salaries to $6,000. The officers are the four stockholders, each of whom receives the same salary. When the president died, the vice-president was made presi-

dent and the president's widow made vice-president at
the same salary her husband had received. The evi-
dence is that the bridge ran itself. The only officer
who had any onerous duties to perform was the
treasurer, who kept the accounts and who received for
this work $1,200 extra. He also served as the presi-
dent of a local bank. The commission felt that all
over $2,400, which represented the salary the executives
of such a self-running corporation might fairly re-
ceive, was a distribution of profits among stockholders,
with tax reduction purposes in view. While we are
reluctant to interfere with the salaries actually paid
officials there is much to support the commission's
view and we will not disturb it.

The amount allowed by the commission for federal
income tax, $3,000, is in our opinion sufficient. Appel-
lant points out that in the year 1928 the company ac-
tually paid $8,860; but the company's gross receipts
that year were $135,500, or over $50,000 more than the
gross return allowed by the commission; 12% on the
excess, $50,000, is $6,000, which reduces the sum paid
to less than the figure allowed by the commission.

We agree with the commission that little reliance
can be placed on the estimated decrease of revenues
which may result from theoretical improved roads and
routes north and south of the bridge. The actual
receipts for 1931 were nearly $3,000 more than esti-
mated by the engineer, equivalent to about 27,000 pas-
sengers. If there is a substantial falling away in
traffic the commission can and will, on the matter being
brought to its attention, permit a revision of the
schedule which will take care of the decreased patron-
age. As a matter of fact, in the past the gross revenue
has greatly exceeded the amount allowed the company;
it has been distributed to the stockholders and is not
considered in this proceeding: Board of Public Utility

Commissioners v. New York Telephone Co., 271 U. S. 23.

For the reasons, thus stated at length, our independent judgment is that the order of the commission, allowing appellant a gross annual revenue of $84,124, is reasonable and in conformity with law, with the exception that the item of $1,331 for bond amortization should not have been excluded.

The allowance should have been:

| | |
|---|---|
| Fair return [7% upon $767,800] ...... | $53,746 |
| Operating expenses ................. | 22,700 |
| Annual depreciation ................. | 7,678 |
| Annual bond amortization ........... | 1,331 |
| Total annual gross revenue ........ | $85,455 |

We are not convinced that the order appealed from requires any other change or modification.

It is, accordingly, modified by substituting an annual gross revenue of $85,455 instead of $84,125, and, as thus modified, is affirmed and the appeal dismissed.