## Newport Home Water Co., Appellant, *v.* Pennsylvania Public Utility Commission.

Argued March 9, 1953; reargued October 2, 1953. Before RHODES, P. J., HIRT, RENO, ROSS, GUNTHER and WRIGHT, JJ.

*Paul H. Rhoads*, with him *Walter W. Shearer* and *Rhoads, Sinon & Reader*, for appellant.

*Jack F. Aschinger,* with him *Lloyd S. Benjamin* and *William J. Grove,* Assistant Counsel, for Pennsylvania Public Utility Commission, appellee.

*David Dunlap,* with him *Alan M. Wolf* and *William S. Morrow,* for intervening appellee.

OPINION BY ROSS, J., January 19, 1954:

The Newport Home Water Company was incorporated on May 10, 1893, under the Act of April 29, 1874, P. L. 73, 15 PS sec. 1351. From 1893 to the present time the company has furnished water service to the residents of the Borough of Newport.

On November 6, 1945 the borough elected to acquire the works and property of the water company under authority of clause 7, section 34 of the Act of 1874, supra, 15 PS sec. 1353, which provides as follows: "It shall be lawful, at any time after twenty years from the introduction of water or gas, as the case may be, into any place as aforesaid, for the town, borough, city or district in which the said company shall be located, to become the owners of said works, and the property of said company, by paying therefor the net cost of erecting and maintaining the same, with interest thereon at the rate of ten per centum per annum, deducting from said interest all dividends theretofore declared."[1] The borough, as required by section 202(g) of the Public Utility Law, 66 PS sec. 1122, filed an application with the Public Utility Commission for a certificate of public convenience. The water company filed a protest contending, inter alia, that the price which the borough would be required to pay under the statutory price formula was in ex-

---

[1] For an outline of procedure under this clause see *Pottstown Borough v. Pa. P. U. C.*, 144 Pa. Superior Ct. 220, 19 A. 2d 610.

cess of the available assets and the borrowing capacity of the borough.

The commission, after finding the borough's borrowing capacity to be a minimum of $121,857 and that the purchase price under *its* construction of the statutory price formula would be $109,456.64, granted a certificate of public convenience to the borough, and the company has taken this appeal.

To arrive at a purchase price of $109,456.64, the commission found the "net cost of erecting and maintaining" the works and property of the Newport Home Water Company to be $98,555.02. Interest at the rate of 10 per cent. per annum on that sum was computed to be $307,415.72; and there was deducted therefrom as "all dividends theretofore declared" the sum of $299,947.23, leaving a difference of $7,468.49 to be added to the net cost of erecting and maintaining. To the sum of $106,023.51 found as aforesaid, the commission added $3,433.13, representing items which it found would be useful to the borough or easily liquidated by it and which could be liquidated by the company only with difficulty and probable loss to it. The company and the borough are agreed that the method used by the commission in computing interest was correct and that the addition of $3,433.13 to the purchase price was proper.

The water company's most conservative application of the statutory formula results in a purchase price in excess of $414,056.77, that figure having been computed as of June 30, 1950. The considerable difference between the commission price and the company price is, according to the company, the result of the following errors by the commission: (1) refusing to make any allowance for the cost of *maintaining* the works; (2) not allowing the sum of $5,324.65 allegedly expended for plant erection in the year

1906; and (3) treating as "dividends theretofore declared" interest on borrowed money, redemption premiums on bonds, undistributed profits, cancellation of a debt owed the company by the estate of a deceased officer and stockholder, and officers' salaries in excess of a sum found reasonable by the commission. The company's contentions will be discussed below in the order of their statement.

(1) It is the contention of the company that the commission erred by incorrectly applying that portion of the statutory formula which provides that the purchase price shall include the net cost of erecting and maintaining the works and property with interest thereon at 10 per cent. per annum. The company takes the position that the commission figure of $98,555.02 represents the expense of *erecting* plant only and thus fails to include any sum for *maintaining* the plant. It contends that the cost of "maintaining" a property is the cost of keeping that property "in repair and in operating condition" and, therefore, the sum of $17,843.23 of accumulated repair expenses together with interest thereon should have been included in the purchase price found by the commission.

The argument against the position of the company and in support of the commission's result is as follows: In the phrase "net cost of erecting and maintaining" the adjective "net" modifies "cost of maintaining" as well as "cost of erecting" and thus renders it clear that the legislature contemplated a *gross* cost of maintaining from which a deduction is to be made to arrive at a *net* cost of maintaining. Since operating expenses are an outlay, the deduction must be a receipt. "If", the commission concludes, " 'maintaining' is to be read as synonymous with 'repairing,' then the phrase 'net cost of . . . maintaining' can only be read as meaning the cost of repairs for which a water

or gas company has not been reimbursed by consumers through payments for water service, or otherwise." The company does not contend that it has not been reimbursed for the cost of repairs.

We think the commission has properly interpreted the statutory language and accordingly hold that the "net cost of erecting and maintaining" the works and property of a water or gas company is the original cost of erecting plant facilities, additions thereto, or replacements therefor, plus the cost of repairs to the extent that such cost of repairs has not been recouped from consumers. The company states: "In the Act of 1874, the companies were put in the position where, by using the money needed for repairs in actually making repairs, the stockholders would be investing that money and would be reimbursed for it." The construction we have placed upon the phrase under consideration assures the investors of reimbursement. It does not, however, as does the construction of the company, *reward* a water company for performing the duty it assumed when it was organized, the duty of keeping its property in such repair that it could adequately serve consumers. It would be manifestly unjust to permit a company to recover the cost of ordinary repairs from its customers by way of charges for water service, and then to permit those costs together with interest to be collected again when the municipality in which the customers reside seeks to acquire the assets of the company. The legislature intended no such result and the commission did not err in refusing to include any allowance in the purchase price for the cost of making repairs to plant facilities.

(2) The second alleged error of the commission was a refusal to include in the cost of erecting plant the sum of $5,324.65 for the year 1906. The commis-

sion found that the sum of $248.33 only was expended for plant in 1906. In July of 1906 the company increased its bonded indebtedness from $30,000 to $80,000. Part of the new issue was used to retire outstanding bonds, and $44,000 of it was delivered to D. Gring, who was then the president of the company. D. Gring expended "only $5,324.65 for the purpose of the company". *Newport Home Water Co. v. P. S. C.*, 76 Pa. Superior Ct. 386, 394. The company at that time charged the entire $44,000 to its plant account. The company now contends that the $5,324.65 expended by Gring "for the purpose of the company" was used for plant facilities.

The company's witness, Conrad F. Mills, a certified public accountant who had examined the books and records of the company, testified that he could find no data to support the entry of $44,000 in the plant account in 1906 and that he knew "of no plant which was installed in that amount". The witness Mills, when asked specifically about the $5,324.65, could suggest no reason why it should be assumed to have been spent for the erection of plant rather than for some other purpose. In summing up his testimony on this point the witness stated: "I found no evidence of any portion of $5,324.65, and I think I so said in my previous answer. That is an expenditure on the books of some person long dead, and the books are probably nowhere in existence at the moment." The commission's conclusion that the company failed to show that the sum of $5,324.65 was expended for plant cannot be disturbed.

(3) A basic conflict exists with respect to the meaning of the phrase "all dividends theretofore declared" as it is used in the statutory formula. The company takes the position that the language is unambiguous and directs that interest is to be reduced

only by formal dividends declared and paid on outstanding capital stock. The borough and the commission, on the other hand, the latter following a line of administrative precedents, contend that the phrase must be construed to include not only dividends in the technical sense but also "disguised" dividends. The commission found the following to be "dividends theretofore declared": Interest on borrowed money, redemption premiums on bonds, undistributed profits, cancellation of a debt and officers' salaries over a sum found reasonable by the commission. The propriety of the commission's action with respect to these items will be examined below.

From 1893 to 1951 the company paid formal cash dividends on capital stock in the aggregate sum of $41,537.48. In that same period it paid $206,408.92 interest on borrowed capital and the commission deducted that amount as "dividends theretofore declared". The company contends that the statutory language is clear and free from all ambiguity and refers only to formal dividends declared and paid on capital stock. The commission and the borough, on the other hand, contend that the legislature cannot have intended the absurd results which flow from a literal interpretation of the phrase under consideration. To illustrate the alleged absurdity of the company position, both borough and commission employ the illustration of two hypothetical water companies with identical plant facilities acquired at the same time at the same cost, identical capital invested and each with a record of having paid the same amount of money for the use of capital. One of these companies elected to raise its capital entirely through the sale of stock, and its "rent" for the use of capital is assumed to have been paid in the form of dividends. The second company, on the other hand, elected to raise

its capital principally by the sale of bonds so that its "rent" for the use of capital was in the form of interest. If the statutory language is interpreted to mean only cash dividends declared and paid on capital stock, then the second hypothetical company which elected to employ "debt financing" would receive a higher price for works and property which cost no more and was worth no more than that of the first company.

We think it clear that the legislature intended that there should be deducted from interest on the net cost of erecting and maintaining any return to investors for the use of their capital. For purposes of this act there is not, nor should there be, any distinction between the hire of money from shareholders and from bondholders. We hold, therefore, that the commission did not err in deducting interest on borrowed capital.

The company's outstanding bonds provide for a three per cent. premium if called before maturity. If the borough takes over the company's works and property, it will require that the bonds be called. The commission treated the redemption premiums on the bonds as dividends on the ground that such premiums are simply a further payment for the use of capital. That action must be sustained on the same reasoning as the commission treatment of interest on borrowed money.

The commission found that the company held the sum of $36,634.91 as "undistributed profits" and deducted that sum as "dividends theretofore declared". The company does not deny the existence of undivided profits nor does it dispute the amount found by the commission, but contends that such profits cannot be classified as dividends. There is, of course, a difference between dividends declared and undivided profits. One represents a sum set aside for and probably paid to stockholders, while the other remains in

the general funds of the corporation and subject to the further discretion of the directors. The difference between dividends declared and undivided profits is, however, without significance in a proceeding such as the present one in which the end purpose is the purchase by the municipality of the works and property of the company. Under such circumstances the portion of the purchase price matching such undivided profits would in the ordinary case be paid over to shareholders. That prudent corporate management dictates that some earnings be "reserved for contingencies, repairs, etc." is unimportant here because if the borough acquires its property the company will no longer be in business. If this proceeding is carried through to its intended conclusion, the company will have no "contingencies" to meet nor "repairs" to make.

In the year 1923 the company cancelled a debt of $7,937.99 owing to it by the estate of D. Gring, who had been president and controlling shareholder of the company from 1906 to the time of his death in 1920. The debt was cancelled at the direction of his son, W. D. Gring, who had become president and controlling stockholder upon the death of his father. The reason given for the action of the son was that the estate of D. Gring was "utterly insolvent". It would appear that the stock of D. Gring passed to his son, W. D. Gring, upon his death and not to creditors of the estate. Under such circumstances it is difficult to credit the statement that the estate of D. Gring was "utterly insolvent". The commission did not err in treating the sum of $7,937.99 as a "dividend theretofore declared".

From 1906 to 1926 salaries in the amount of $25,-448.19 were paid to D. Gring and W. D. Gring while they, successively, were president and major shareholder of the company. The average annual salary paid to the Grings during the 21 years in which they

controlled the company was, therefore, about $1,200. The commission found that the monetary value of the services performed by the Grings in that 21-year period was $900 a year, or $18,900 for the whole period. The difference between the total salaries actually paid to the Grings and the total found by the commission to be reasonable, the sum of $6,548.19 was treated as a dividend. We think the commission erred in this particular.

In *Clark's Ferry Bridge Co. v. P. S. C.*, 108 Pa. Superior Ct. 49, 165 A. 261, at pages 78-79 we stated: "Salaries were fixed at $2,400, as in the first report. The company had been paying $4,800 but increased the salaries to $6,000. The officers are the four stockholders, each of whom receives the same salary. When the president died, the vice-president was made president and the president's widow made vice-president at the same salary her husband had received. The evidence is that the bridge ran itself. The only officer who had any onerous duties to perform was the treasurer, who kept the accounts and who received for his work $1,200 extra. He also served as the president of a local bank. The commission felt that all over $2,400, which represented the salary the executives of such a self-running corporation might fairly receive, was a distribution of profits among stockholders, with tax reduction purposes in view. While we are reluctant to interfere with the salaries actually paid officials there is much to support the commission's view and we will not disturb it."

In the case at bar we find no evidence that the waterworks "ran itself" as did the bridge in the *Clark's Ferry Bridge Co.* case, nor do we have the inference of a gratuity that arises when the widow of an officer moves into the company at the same salary her husband received. On the contrary, there is here evi-

dence that both Grings rendered services for the company. The commission placed upon the company the burden of proving the reasonableness of the salaries paid to officers for services rendered many years before the hearings. No record that the company could be expected to keep in the ordinary course of business would disclose the nature and quantity of services performed by such officers. It is very unlikely that there was any witness available to the company who had observed the work or lack of it performed by the Grings for the company. The commission, we feel, had no sound basis for reducing the salaries paid to the Grings and for treating the difference between salaries actually paid and an amount found by it to be reasonable as dividends. However, since this would not increase the purchase price to the amount of the minimum borrowing capacity of the borough, it is not determinative of this appeal.

Order affirmed.