The Peoples Natural Gas Company, Appellant, *v.*
The Pennsylvania Public Utility Commission.

476

478

Argued April 29, 1943.   Before KELLER, P. J., STADT-
FELD, RHODES, HIRT, KENWORTHEY and RENO, JJ.
(BALDRIGE, J., absent).

*Wm. A. Dougherty,* with him *C. W. Cooper, James
B. Sayers, G. Kirby Herrington, William R. Scott* and
*James L. White,* for appellant.

*Samuel Graff Miller,* with him *Harry M. Showalter,* for appellee, Public Utility Commission.

*Anne X. Alpern,* City Solicitor, with her *John Bentley,* First Assistant City Solicitor, for City of Pittsburgh, intervenor.

*Nathaniel K. Beck,* Assistant County Solicitor, with him *Walter P. Smart,* County Solicitor, for Allegheny County, intervenor.

*Richard H. Gilbert,* for Borough of Tyrone, intervenor.

OPINION BY KENWORTHEY, J., November 10, 1943:

This appeal by the Peoples Natural Gas Company is from a final order of the Public Utility Commission declaring unreasonable and excessive the rates of appellant, directing substantial refunds for the years 1939 to 1941, inclusive, and ordering the filing of new tariff schedules which would reduce the revenues from domestic and commercial consumers and produce revenues from these classes of consumers not to exceed $6,108,143. In addition to necessary operating expenses it allowed a return of six and a half per cent (6½%) on a rate base of $21,566,085. The commission found the fair value of appellant's property, used and useful in rendering the service, as of the date of the order nisi (March 4, 1942), was $20,000,000 to which it allowed an addition of $1,566,085 for working capital.

The early history of the proceedings is set forth at length in our opinion on the previous appeal reported at 141 Pa. Superior Ct. 5, 14 A. (2d) 133, and will not be repeated here.

Pursuant to our order remanding the case, further hearings were held in September and November 1940, and the record was closed on November 15, 1940. On.

March 4, 1942, the commission filed its order nisi; the final order was filed December 7, 1942.

The appeal raises a number of questions. We shall consider them and the facts material to each question under separate headings.

## The Rate Base

*Physical Property*

The commission found "that the reproduction cost of respondent's property at December 31, 1938, without deduction for accrued depreciation, was $72,236,739." It also found "that the original cost of all of its property in use at December 31, 1938, was $47,732,478." Based upon the estimates of the commission's expert, it found an over-all depreciation of forty-five per cent (45%) which, when applied to the reproduction cost reduced it to $39,730,207, and when applied to the original cost, to $26,252,863. In discussing present fair value, the commission also mentioned two other figures: (a) $9,869,793 which it called 'Book Value,' and (b) $12,-744,126 which it spoke of as 'Invested Capital' or the number of dollars which the owners invested in the corporation. The commission found: "After having considered each of the elements specifically mentioned in this section of our order, and having weighed carefully all other facts of record which might be considered relevant thereto, we find and determine that the fair value rate base of respondent as a going concern, exclusive of working capital, is $20,000,000 as of the date of this order."

It is to be noted that the commission's finding of fair value is little more than half the amount it found it would cost to reproduce the property, less depreciation. It was less than it found was the original cost, less depreciation. And the original cost figure used by the commission gave no consideration whatever to the uncontradicted evidence that, if the actual cost had been adjusted to reflect the price levels of December 31,

1938, it would have been approximately the same as reproduction cost.

It has been said that "to avoid danger of reversal, commissions [are] often at pains to camouflage the real basis of valuation by giving lip-service to 'considering' and 'giving due weight' to all factors mentioned in Smyth v. Ames." [1] It is obvious that the commission here has adopted a rate base directly related to (though less than) depreciated original cost and has completely ignored its own finding that the cost of reproduction, less depreciation, was nearly $40,000,000. [2]

It is important in a proceeding of this kind to bear in mind what is to be the rate base. If it is prudent investment, original cost or original cost less the depreciation reserve are necessary and perhaps controlling considerations. But prudent investment and fair value are wholly different things. The conception of Mr. Justice BRANDEIS, expressed in his dissent in the South western Bell Telephone case, [3] which is a landmark in the controversy still waging over the merits of prudent investment versus fair value, was not that original cost was value but that prudent investment was a *rate base* more desirable than value. [4]

---

[1] Bauer & Gold, Public Utility Valuation (1934), 103.

[2] In fairness, it should be said that in its disposition of all of the points raised, the commission was undoubtedly very much influenced by the decision of the Federal Power Commission in *Pa. P. U. C. v. Hope Natural Gas Co.,* 44 P. U. R. (N. S.) 1 (1942), a case instituted by the commission against an affiliate of this appellant. But, on appeal, the order of the Federal Power Commission was reversed by the Circuit Court of Appeals for the Fourth Circuit (one judge dissenting) in a comprehensive opinion by Judge PARKER for whose industry and wisdom we acknowledge a considerable debt. See *Hope Natural Gas Co. v. Federal Power Commission,* 134 Fed. (2d) 287. (Certiorari allowed, 63 S. C. 1165).

[3] *Missouri ex rel. Southwestern Bell Telephone Co. v. P. S. C.,* 262 U. S. 276, 289, 43 S. Ct. 544.

[4] His argument was that all the fourteenth amendment guar-

Although the opportunity to debate the respective merits of these wholly different theories of rate fixing offers an alluring challenge, an extended discussion would serve no useful purpose here. For the legislative mandate in this commonwealth is that the rate base is fair value (*Solar Electric Co. v. P. U. C.*, 137 Pa. Superior Ct. 325, 335, 336, 9 A. (2d) 447), except that for the determination of temporary rates under Section 310,[5] original cost less accrued depreciation may be used.[6] The doctrine, irrespective of its merits, entrenched in our law until the legislature changes it, requires the commission to determine what the present fair value of the property *really is* and does not permit it to adopt the recommendation of the economists who argue that the commission's function should be one of *choosing* a proper rate base—of deciding how much the property should be *permitted* to be worth rather than of discovering how much it actually *is* worth.

What is competent evidence—what are the elements—of present fair value?

There has been much confusion, stemming, perhaps, from the somewhat vague and inconclusive dictum of

---

antees is a reasonable net return on the capital invested; that the use of such a rate base has obvious practical advantages for the purpose of rate regulatory procedures; and that its adoption would avoid the hardship on consumers compelled to pay high rates during periods of high prices and the hardship on investors compelled to accept a low return during periods of low prices which necessarily result from the use of a fair value base. In other words, Mr. Justice BRANDEIS' objective was to adopt a base which would not vary with the fluctuations in value.

[5] Act of May 28, 1937, P. L. 1053, 66 PS §1150.

[6] The constitutionality of this base has been upheld by a statutory federal court on the ground that the utility is given, by the section, a right of recoupment in the event that the final determination of fair value indicates the rates thus fixed were too low. *Beaver Valley Water Co. v. Driscoll,* 28 F. Supp. 722. The question, however, has not been passed upon by either of the appellate courts of this state nor by the Supreme Court of the United States. See *Solar Electric* case at 347, 348.

Mr. Justice HARLAN in *Smyth v. Ames.*[7] The repeated lip-service which commissions and courts have given this formula has obscured rather than clarified the rate-base-finding process. For by 1926, the Supreme Court of the United States had virtually committed itself to reproduction cost at current prices as, in effect, the dominant basis of value *under ordinary circumstances and reasonably stable prices.*[8] As late as 1939, this court pointed out[9] that in an unbroken line of decisions of our Supreme Court and this court, "the cost of reproducing the property has consistently been held to be not only a relevant but also an essential element in the ascertainment of its 'fair value' for rate-making purposes." This is particularly true where, as here, according to the uncontradicted evidence there was little or no obsolescence and the property, if replaced, would be almost identically reproduced. See *Ben Avon Boro v. Ohio Valley Water Co.,* 260 Pa. 289, 309, 103 A. 744.

This does not mean that in every case depreciated reproduction cost is, under our decisions, identical with present value. We have said it is not. See *Bangor Water Co. v. P. S. C.,* 82 Pa. Superior Ct. 48, 55; *City of Philadelphia v. P. S. C.,* 84 Pa. Superior Ct. 135, 150. In determining what is, from the facts of a particular case, the best evidence of present value, the commission and this court is under a duty to exercise an intelligent and discriminating judgment. But since the test is one of reason, the weight to which a par-

---

[7] 169 U. S. 466, 546, 547, 18 S. Ct. 418.

[8] *McCardle v. Indianapolis Water Co.,* 272 U. S. 400, 412, 47 S. Ct. 144. The court intimated that, if prices were not reasonably stable, that is if they were inordinately high or low and might reasonably be expected to change in the near *future,* the prospective change could be taken into consideration or an average of costs over a period of years taken. See discussion of this case by Bauer & Gold, supra, at 98-103.

[9] *Solar Electric Co. v. P. U. C.,* supra, at 344.

ticular element is entitled in a given situation will vary.

A brief discussion of the other so-called 'elements' which the commission said it 'considered' will demonstrate why they must assume a subordinate position— and some of them be entirely disregarded—in a proper determination of present fair value under the circumstances of this case.

*Original cost* has been approved as a rate base where (1) there has been no great change in cost levels and (2) there has been a change but proper adjustment is made based upon competent evidence of price trends. See *Clark's Ferry Bridge Co. v. P. S. C.*, 108 Pa. Superior Ct. 49, 165 A. 261, aff'd 291 U. S. 227, 54 S. Ct. 427, and *Scranton-Spring Brook Water Service Co. v. P. S. C.*, 119 Pa. Superior Ct. 117, 181 A. 77. As stated by the Supreme Court of the United States in *McCardle v. Indianapolis Water Co.*, supra (note 8), at 411: "Undoubtedly, the reasonable cost of a system of water works, well planned and efficient for the public service, is good evidence of its value at the time of construction. And such actual cost will continue fairly well to measure the amount to be attributed to the physical elements of the property *so long as there is no change in the level of applicable prices.*" (Italics supplied.)

In the present case, appellant started business in 1885. A substantial part of the property—about forty per cent (40%)—was put in service prior to 1917. It offered evidence, which was uncontradicted, that if the original cost figures were trended to reflect current prices of labor and materials the total original cost would approximate its estimate of reproduction cost. That there have been great changes is shown by many publications, statistical reports and other documents readily available. The *extent* to which these changes have increased the present value of appellant's property was a fact within the commission's province to

determine. But it was wrong in taking the position there had been *no* changes in the face of the common knowledge that there had.

'*Book Value.*' This figure—$9,869,793—was arrived at by taking the total value of the physical property shown on appellant's balance sheet for December 31, 1938 ($39,283,989), and deducting from it the total reserve for depreciation ($29,414,196.)

The method used in arriving at this figure is the formula advocated by most of the supporters of prudent investment. The theory, simply illustrated, is as follows: The utility starts business with a capitalization of $50,000, all of which is invested in the plant. At the end of ten years, it has accumulated, through annual charges to the consumers, a depreciation reserve of $25,000, all of which it has invested in additions to the plant, and has invested an additional $25,000 out of earnings. The original cost would then be $100,000, and the amount invested by the owners as distinguished from the consumers is determined by the formula: original cost less depreciation reserve.

The method has no place and is entitled to no consideration in the determination' of value. This depreciation reserve is nothing more than a bookkeeping figure. It is not represented by cash or investments in bonds and stocks. It represents the total of the sums which annually the managers of appellant thought should be set up on the books to replace property which would be retired in the future. And the only effect of this accounting procedure was to make the portion of appellant's earnings thus set aside unavailable for dividends or for additions to surplus. And the funds thus withheld from the stockholders have been reinvested in property used in serving the public. If throughout the period this reserve has been accumulated appellant has consistently earned and paid liberal dividends, it may be argued that the property bought with these funds was, in fact, paid for by the ratepayers,

not the owners, and that the owners, therefore, *ought* not to have the earnings from it. But this ought-not argument can be disposed of by pointing out that, under the existing law, the only test is the present fair value of the property used and useful in rendering the service. That appellant owns the property and is using it in the service is unquestioned. And, so long as present fair value is the test, it makes no difference whether appellant bought it, received it as a gift, or won it in a lottery. See *Bd. of Commissioners v. N. Y. Tel. Co.,* 271 U. S. 23, 32, 46 S. Ct. 363.

Moreover, it cannot be argued that the depreciation reserve should be deducted from the book cost of the property on the theory that it represents the *actual* depreciation of the property. This argument would run counter to the commission's specific finding that the actual depreciation was forty-five per cent (45%) whereas the deduction of $29,869,793 from the assumed cost of $39,283,989 would indicate a depreciation of over seventy-five per cent (75%).

*'Invested Capital.'* This figure—$12,744,126—is what the commission found represented appellant's capitalization.

Even the severest critics of the present value doctrine. concede that capitalization is ordinarily no evidence of value.[10] The history of the capitalization of appellant in the present case clearly demonstrates that it has not in the past, nor does it in the present, bear any direct relationship to value.

For example although between 1935 and 1939 appellant was constantly growing and, in 1938, acquired by merger property having an original cost of $10,751,407, its capitalization was reduced, during the same period, from $25,571,524 to $15,095,346.

---

[10] See Harry R. Booth, Prudent Investment, Fair Value and Public Utility Regulation, 1 National Lawyers Guild Quarterly, 229, 233.

Apparently appellant, throughout its history, has always been able to pay substantial dividends and has built up its properties by plowing back earned surpluses. This is strong evidence that, at least during the early years of its life, its earnings, and perhaps its rates, were unreasonably high. But this is not a proceeding to determine the reasonableness of the rates of appellant between 1885 and 1913 when the legislature first undertook the comprehensive regulation of the rates of public utilities. Such an attempt would require the determination of innumerable factors which are absent from the present record and could not possibly be supplied. The suggestion that either the present stockholders—who may be entirely different from the stockholders during the earlier period, although the stock has been wholly owned by the Standard Oil Co. of N. J., because the latter stockholders have changed from time to time—should be penalized because of the unjust enrichment of their predecessors, or that the present consumers should benefit from the high rates paid by earlier consumers does not appeal to us. The vague feeling that there may have been a past wrong we would like to right does not, in our opinion, furnish an adequate basis for taking property from the present owners and giving it to someone else.

The fact that it may have earned excessive returns in the past has no bearing whatever on what, under present-day regulatory procedure, it is entitled to earn on the basis of the fair value of the property presently dedicated to public use. *Bd. of Public Utility Commissioners v. N. Y. Tel. Co.,* supra.

So long as present fair value is the rate base and since depreciated cost of reproduction is the best evidence of it offered in the present case, the findings of the commission (1) that the depreciated reproduction cost was nearly $40,000,000, and (2) that present fair value was $20,000,000 are inconsistent and

irreconcilable. These findings are analogous to a verdict of a jury with special findings which are inconsistent. The case will be returned so that these findings may be reconciled. For, although it is this court's function, in cases in which it is contended there is confiscation, to determine the facts as well as the law (*Ben Avon Boro v. Ohio Valley Water Co.*, 253 U. S. 287, 40 S. Ct. 527; *Solar Electric Co. v. P. U. C.*, supra, at 354) we ordinarily prefer that proper findings be first made by the commission as an aid to us in performing that function. See *Scranton Spring Brook Water Service Co. v. P. S. C.*, supra, at 122, 123.

This is not to say that on rehearing the commission is bound to find that present fair value approximates $40,000,000. In spite of its express finding that depreciated reproduction cost approximated that amount, it indicated in its discussion that the evidence offered by appellant that it would cost $72,236,739 to reproduce the property new should not have been given full weight. It perhaps would not have been incorporated into its finding if the commission had fully understood that the finding was bound, under the law, to play such an important part in the determination of the ultimate finding of fair value. The commission should be given an opportunity to reconsider the weight of this evidence and, if it so desires and is in a position to do so, to offer in evidence its own estimate of reproduction cost. See *Solar Electric Co. v. P. U. C.*, supra, at 348, 349. Or, in view of what we have said, the commission may use original cost as a base provided it makes proper adjustments for increases in prices.

It is a fact of considerable importance that most of the decisions of our own appellate courts and, for that matter, of the Supreme Court of the United States, establishing the elements of fair value for rate-making purposes were rendered before our legislature adopted the Public Utility Law of 1937 and

wrote 'fair value' into Section 311 (66 PS §1151) and that standard, minus a detailed list of the elements constituting fair value, was carried over from the Public Service Act of 1913.[11] It is a settled rule of construction: "That when a court of last resort has construed the language used in the law, the Legislature in subsequent laws of the same subject matter [may be presumed to] intend the same construction to be placed upon such language."[12] And it is important to bear in mind that, even though the Supreme Court of the United States as presently constituted, may, in the near future, overrule some of its former decisions and uphold as constitutional something other than fair value as a rate base, such change of position would not effect a change in the law of this commonwealth.[13] Since the legislature put fair value into our law, together with what in 1937, when the law was passed, was universally understood to have been the elements of fair value, that body alone can take it out and substitute something else in its place. If and when the change comes—the concurring justices in *Federal Power Com. v. Natural Gas Pipeline Co.*, 315 U. S. 575, 606, 62 S. Ct. 736, suggest that it has already taken place— it will simply mean that a constitutional limit on the power of the legislature to experiment or innovate will have been removed.

*Depreciation*

The finding that appellant's physical property had depreciated forty-five per cent (45%) was largely based upon the testimony of Farstadt, the commission's engineer. His contribution consisted of estimates of *lives* of the various types of plant classified according to accounts. For example, he estimated life of field measur-

---

[11] Act of July 25, 1913, P. L. 1374 Art. V. §20.

[12] Act of May 28, 1937, P. L. 1019, §52, 46 PS §552.

[13] See Paul G. Kauper, Wanted: A New Definition of the Rate Base, 37 Mich. L. Rev. 1209, 1233.

ing station structures to be forty years, field line construction thirty-three years, drilling and cleaning equipment thirty years, etc. He based these estimates primarily upon studies which he made of treatises, and of tables furnished by the Interstate Commerce Commission and the U. S. Bureau of Internal Revenue. Although he said that they were also based "upon my general familiarity, with conditions in the particular territory involved," he clearly indicated elsewhere he had made no attempt to base them on the observed condition of appellant's plant. He admitted that he made no investigation of appellant's experience with the retirement of various types of its property. Although the quality of maintenance of property is a vital factor in determining its life, he apparently made no special effort to consider it. He gave meters an estimated life of forty years. Although he said the depreciable portion of meters would not be more than twenty-five per cent (25%) to thirty per cent (30%) he had no knowledge when, how often and how recently these depreciable parts had been replaced "and had they been [recently] replaced, the meters would be in as good a condition as new, for all practical purposes." Almost every type of machinery or equipment might have its age constantly reduced as well as its life indefinitely extended by the replacement of wearing parts. A pipe line built in 1900 might, in the year 1940, through periodic replacements of sections of it, have an average or over-all age of ten years. Although Farstadt estimated the life of compressing station equipment at thirty-three years, he testified that one of appellant's stations (Brave) had been in operation for more than thirty-three years and "this plant is in good operating condition."

The difficulty with any theoretical method of estimating lives is perhaps apparent from the foregoing discussion of Farstadt's testimony. Even though the tables be the best available, they are open to the same

objections which have induced our Supreme Court to restrict the admission of human mortality tables in negligence cases.

But even if the commission's method of arriving at the estimated lives of the various classes of property were acceptable, there are other difficulties presented by the method in which it estimated the average existing *ages* of the property. The commission claims to have made these estimates from the company's own records. If the company had kept adequate property records indicating exactly when various types of property were dedicated to the public use and the various additions and retirements these records would undoubtedly have served the purpose. But the records merely showed, by accounts, the year-by-year expenditure of *dollars* for the various classes of property. The difficulty with attempting to determine the average age of a particular class of property such as meters from the records showing the years in which a given number of dollars were expended for installing them is that it assumes, to have any validity, that the price of the meters installed remained constant throughout. If, as was the case here, the prices were constantly undergoing change, the number of meters or other kinds of property installed in a particular year could not be determined from the number of dollars invested.

Except for the mortality of plant caused by fire, floods and other accidents, which should not be considered in determining present value (a brand-new compressor is still brand-new although it may be destroyed by an explosion tomorrow), there are but two factors which determine mortality, (1) physical deterioration and (2) obsolescence. In determining these factors, it seems that there never can be an adequate substitute for actual observation of the condition of the property coupled with a study of its state of obsolescence. We have said so—see *Clark's Ferry Bridge Co. v. P. S. C.,*

supra, at 74, 75—although we have also said that theoretical age-life estimates are entitled to consideration. [Appellant's engineer made what from his testimony seemed to be adequate studies of the physical condition of the property. He estimated the over-all depreciation at 26.02%. The commission was not bound to accept his figure. But, on the basis of the present record, it was the commission's duty to give some weight to it and, in wholly disregarding it and accepting the theoretical estimates of the commission's witness, its action was arbitrary. It should not have closed its eyes to the present condition of the property and computed depreciation on the basis of mere formulas alone.]

*Exclusion of Expensed Items*

In determining the rate base, the commission excluded $7,558,226 (the actual mechanics were that it found depreciated original cost, $26,252,863, and then deducted an additional $4,157,024 which represented $7,558,226 depreciated by forty-five per cent (45%). On the basis of the present record, it is conclusively settled that the deducted sum represented capital investment because the commission included it in its finding that the original cost of the property was $47,732,478. Under the system of accounting in use prior to 1920 (and apparently authorized), the items representing this investment which consisted principally of cost of drilling wells, pipe lines, etc., were treated as expenses. The position which the commission took in the order nisi was that appellant had been reimbursed in full for these expenditures and was, therefore, not entitled to have them considered as an element of the rate base "to be paid for again by the consumers." In its final order, it said: "If the past records were truthful and are now relied upon, no one is hurt by such reliance; if the records were false, and such falsification resulted in over-charge to another party, the story they tell cannot now be altered

so that the injured party must repeat payment of the over-charge."

The books of the company are, of course, not conclusive. This is well settled. *Solar Electric Co. v. P. U. C.,* supra, at 351, 352; *Missouri ex rel. Southwestern Bell Telephone Co. v. P. S. C.,* supra, note at 295. The real merit in the argument, if there is any, must rest on an equitable basis. If throughout the period these capital investments were treated as expenses the company was nevertheless able to earn a fair net return on the value of the property dedicated to the public use it would be some evidence, at least, that the rates, during that period, were too high. We have already indicated the reasons why this argument is without merit so long as present fair value is the base.

The identical question is discussed by Judge PARKER. in *Hope Natural Gas Co. v. Federal Power Commission,* supra, Note 2. His conclusion is aptly expressed at page 303: "If the property were being condemned, no one would suggest that items which went into the cost of producing it should not be considered as a part of its cost, whatever method of accounting it had employed. If it were being sold on the basis of cost, no court would exclude such items from consideration. And there is as little ground for excluding them from consideration in a proceeding like this, where value is being determined as a basis for rates which must compensate the company for the gradual sale of its property through use as well as provide a return upon its investment. Certainly if the company had charged to capital investment items which should have been charged to expense, there would be no excuse for not eliminating them in the valuation of the property; and there is as litttle excuse for not considering as capital investment items erroneously charged to expense. Bookkeeping which does not reflect realities must not be allowed to obscure the real nature of the inquiry."

*Working Capital*

The allowance for working capital of $1,566,085 was probably a little low under the evidence although we are not persuaded that it was erroneous.

### RATE OF RETURN

The six and one-half per cent ($6\frac{1}{2}\%$) allowed by the commission was not unreasonably low. As we pointed out in the *Solar Electric* case, in which we sustained a rate of return of six per cent (6%), the factors involved in the exercise of judgment as to what constitutes a fair rate of return are so varied and complex that each case must necessarily stand on its own feet and no arbitrary yardstick is possible.

The Supreme Court of the United States said in *Bluefield Water Works v. Public Service Commission,* 262 U. S. 679, 693, 43 S. Ct. 675: "A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally." And in *United Railways and Electric Co. v. West,* 280 U. S. 234, 249, 50 S. Ct. 123, the same court said: "What is a fair return within this principle cannot be settled by invoking decisions of this court made years ago based upon conditions radically different from those which prevail today. The problem is one to be tested primarily by present-day conditions."

Appellant offered the evidence of a financial expert who undertook to demonstrate, by the use of statistical data, that a fair and reasonable return should be not less than seven and eight tenths per cent (7.8%). But what we said in the *Solar Electric* case (pp. 387, 388) about similar evidence and the numerous considerations in determining a fair rate is equally applicable here. In our opinion the rate was not confiscatory.

### ANNUAL EXPENSES

*Depreciation Allowance*

The commission allowed $600,000; appellant's wit-

ness, Rhodes, contended the allowance should have been $1,300,000. Recognizing the fundamental principle that the annual depreciation allowance must be correlated with accrued depreciation, the commission criticized the witness for inconsistency in not more intimately tying the two things together. It pointed out that if the observed depreciation contended for by the witness was only 26.02%, the annual allowance asked for was too high. A possible valid explanation of the discrepancy might be found in the claim of appellant that it was entitled to some consideration for the depletion of oil wells and leases not reflected in the observed depreciation of appellant's physical plant. And the criticism of Rhodes' inconsistency is equally applicable to the commission because it did not allow as much as required by a direct tie-up with the finding the plant was forty-five per cent (45%) depreciated. But apart from this, what the commission actually did in computing the allowance, as distinguished from the discussion, is the thing of importance.

What the commission did was this: It took appellant's retirement experience for the period between 1921 and 1937 and computed the average annual capital loss due to retirements at 1.035%. It then applied this percentage to what it found to be the undepreciated original cost ($38,865,972—$47,732,478 less 'expensed' items) which produced a figure of $402,263. It then said: "After consideration of all of the evidence of record, we are of the opinion that $600,000 constitutes an adequate allowance for annual depreciation."

Appellant complains that the commission made no allowance for the depletion of wells and leases and the cost of abandonments. It is true that no specific allowance was made for either of these items and they were not reflected in the table of retirements experience which the commission used in its computation. But the commission made an allowance of $200,000 over and

above what it calculated to be the average annual capital loss due to retirements and, since there are no other specific items which appellant contends were omitted from the calculation, it seems fair to assume the commission gave them some consideration. The real question is whether it gave them enough. Appellant's evidence indicated the allowance for depletion of wells and leases should have been in the neighborhood of $400,000 a year and that the additional allowance for cost of abandonments should have been about $75,000 per year. But this evidence was not binding on the commission nor on this court and the record indicates the commission made a substantial allowance for these two items. It would have perhaps been a little better if it had discussed these claims specifically and indicated why it was making an allowance of only $200,000 when appellant's uncontradicted evidence indicated it should have been in the neighborhood of $475,000. But we find no reversible error.

*Cost of Gas Purchased from Independent Producers*

Apparently a substantial part of appellant's gas supply is purchased from a large number of independent Pennsylvania producers. Contracts were made with them in the 1920's that called for a price of approximately 22¢ per thousand cubic feet. Because of the tremendous reduction in appellant's sales caused by the depression, in 1933 appellant went to all these producers and got most of them, but not all, to agree to an amendment, under the terms of which the price was to be reduced to 18¢, with the proviso that, in the event its rates should be increased, there would be an increase in the price equivalent to 30% of the increase in the average rate for gas sold to domestic consumers.

The new rates which are challenged by this proceeding went into effect on July 1, 1940, and using the formula in the contracts above referred to, the price to the independent producers was increased to 21.6¢.

The commission disallowed the increase and figured operating expenses for the last half of 1940, for the years 1941 and 1942, and for the future at the 18¢ rate.

We do not understand that the commission challenged the bona fides of the contracts made with the independent producers nor their reasonableness nor their validity. It seems clear that since the commission disallowed the increase in appellant's rates it concluded that *under the terms of the contracts* with the producers appellant was not obliged to pay the higher price for the gas.

In the event some portion of the increase in rates is ultimately allowed, the commission will undoubtedly allow the correlated increase in the price which appellant is required, under the terms of the contracts, to pay for the gas it purchases. To an extent, at least, therefore, appellant's objection to this part of the order may be automatically taken care of.

If the full increase in rates is not allowed, appellant would not be required to pay 21.6¢ for its gas but some lesser sum which would be related to the increase in rates allowed. In that event the fact that appellant has already paid the higher price for the two and a half years involved may present a difficulty. But if there is a difficulty, it is of the appellant's own making. It was bound to know that an increase in its rates might be challenged and that they would not become final until and unless approved by the commission. It seems that it could and should have taken some precaution to protect itself against the ultimate disallowance of the increase. If the producers have been overpaid, appellant may have a right to recover back or to establish a credit to the extent of the over-payments. It probably would have been safer to have deposited the sums representing the increase in prices in escrow or to have withheld the payments until the question of its liability for them was ultimately established.

When the commission ultimately determines the amount of appellant's rates it need not concern itself about the predicament in which appellant has voluntarily placed itself.

Appellant presents a subsidiary argument in this connection based on the fact that the commission, in calculating the purchase price of the gas, used a flat 18¢ rate prior to July 1, 1940, and a flat 21.6¢ rate thereafter. It points out that because not all of the independent producers agreed in 1933 to reduce the rate to 18¢ the average price paid on *all* contracts prior to July 1, 1940, exceeded 18¢, and since that date the average price has exceeded 21.6¢. The error in this method of computation seems to be clear and, although it does not involve a lot of money, it should be corrected on the return of the case to the commission.

*Rate Case Expense*

Appellant made the following expenditures for making the studies and procuring the data required by the commission in this proceeding:

| | |
|---|---|
| 1937 ..................... | $150,648.50 |
| 1938 ..................... | 340,873.58 |
| 1939 ..................... | 354,186.85 |
| 1940 ..................... | 25,361.00 |
| 1941 ..................... | 7,782.00 |

The commission allowed these as proper expenses and, at the suggestion of appellant, agreed that they should be amortized over a five-year period at the rate of $169,806 per year.

Appellant contends the method of amortization works a hardship because it is compelled to absorb the yearly proportion of the expenses in two years (1937 and 1938) in which its rates were not too high; that the only method by which it can be wholly reimbursed for this expense is to collect it from the consumers during the years in which its rates were found to be excessive by having it allowed during those years as a proper expense.

Logically, this argument seems unanswerable; in fact, the commission does not attempt to meet it. Under the commission's order appellant simply cannot recover $339,612 (2 x $169,806) of the expenses to which it was put by the inquiry into its rates.

But our decisions indicate there is no hard and fast rule which requires the commission to allow the entire rate case expense. In the *Solar Electric* case where the utility was defending its *existing* rates against attack, we held it was entitled to reimbursement. But we distinguished *Scranton-Spring Brook Water Service Co. v. P. S. C.*, supra, at 143, 144, where the utility, as here, initiated the action by filing a tariff schedule raising its rates to an extent found excessive and unreasonable. Under the authority of the latter case the commission, in view of its main conclusion that the new rates were excessive might have refused to allow any part of these expenses; under the circumstances its action in allowing appellant to collect three-fifths (3/5ths) from the public seems liberal.

The problem will require reconsideration when the case goes back. If the new rates are *substantially* upheld (see *Scranton-Spring Brook* case) the expenses should all be allowed or at least to the extent they will be recoverable under the new rates. If the increased rates are allowed *in toto* the problem will be forgotten since appellant would have no way of securing reimbursement without a further increase in its rates for the specific purpose.

*Federal and State Income Taxes*

Of course, these figures will require revision if the allowable income is changed when the commission reconsiders the case. Appellant's principal complaint is that the commission used figures for the years 1939, 1940 and 1941 taken from one of appellant's exhibits which apparently showed accruals for taxes during these years, and that, if appellant had been given an adequate

opportunity to explain or qualify them, it would have appeared that the actual liability for taxes was substantially in excess of the amounts which the commission allowed. It is also contended that certain permissible deductions were taken during these years which would not be available to appellant for 1942 and future years. It does not appear from the record that appellant was deprived of a full opportunity to explain. But clearly such opportunity should be, and we assume will be, given when the case is returned for further consideration.

### REFUNDS

The commission ordered refunds for the following years and amounts:

| | |
|---|---|
| 1939 | $ 260,882.00 |
| 1940 | 745,752.00 |
| 1941 | 1,140,324.00 |

These amounts represent the excess earned during these years over and above the commission's allowed return.

Pointing out the rates charged for 1939 and until July 1, 1940, when its new tariff schedule became effective, were commission-made rates, appellant contends that as to that period the order was invalid on the authority of *Cheltenham & Abington Sewerage Co. v. P. U. C.*, 344 Pa. 366, 25 A. (2d) 334.

The commission, in its brief, virtually concedes the validity of this contention. It contends we should not consider it because it was not raised before the commission nor made the basis of a specific assignment of error in this court. And, in effect, it urges us to disregard the decision of the Supreme Court and that, ". . . . . . if this Court [the Superior Court] will repeat its views, the Commission will do its utmost to sustain them if questioned on appeal."

The Supreme Court decided the *Cheltenham* case about three weeks after the commission's order nisi and perhaps it had not come to the commission's attention

by the time the final order was filed. Under the decision the order for refunds prior to the effective date of the new rates was clearly erroneous. We, of course, cannot overrule the Supreme Court and when the case goes back we have no doubt the question will be properly presented to the commission and that it will follow the decision.

Appellant also argues that in determining the amount of refunds the commission's attitude was arbitrary and unreasonable in failing to compute the refunds by taking an average of a number of years in which were included several years during which appellant earned less than the commission's allowed return. The argument is without merit in view of the rule of the *Cheltenham* case which should give appellant all the protection needed. It seems to us the proper application of that case would not only excuse appellant from making refunds for the year 1939 and the first half of 1940, but also for earnings in subsequent years up to the date of the commission's order nisi (March 4, 1942) which were not attributable to the higher rates put into effect on July 1, 1940. Appellant concedes in its brief it is not entitled to rely on the *Cheltenham* case to relieve it entirely from the duty to make refunds for the period July 1, 1940 to March 4, 1942. And it does not make the distinction we are suggesting. But since appellant's returns reached a point where they were substantially in excess of the commission's allowed return even under the old rates, the effect of the order was to compel appellant to file a schedule lower than the old commission-made rates and *to that extent* it could not be required to make refunds prior to the date of its order. In other words, the refund order should be limited to the period July 1, 1940 to March 4, 1942, and to the amount of excess returns due to whatever portion of the attempted increase in rates is ultimately disallowed.

### Effect of Appellant's Estimate of Income Under New Rates

When appellant filed its new tariffs, it also prepared and filed an exhibit showing an estimate of net income for normal future years which was substantially less than the income the commission allowed. The commission argues this indicates that, at least when the new rates were filed, appellant felt such income would be reasonable and adequate, and that since the commission actually allowed more appellant should be satisfied. The fallacy of this argument is apparent.

The new tariffs were filed in March 1939. During the previous year (1938) appellant, under the old rates, had an operating deficit of about $500,000. Obviously, unless its sales in the future were to substantially increase or unless it could maintain the existing sales at increased rates, the enterprise would have ended in bankruptcy. But the amount which, in the judgment of appellant's management, the increased rates would produce did not necessarily represent the amount which, in its judgment, would produce a fair return on the present value of its property. A utility cannot merely by the simple device of increasing its rates, increase its net income to whatever amount it desires. Throughout most of the recent economic depression the majority of the railroads of the country were earning considerably less than a fair return; yet, with few exceptions, the device of increasing rates was not attempted. The reason is obvious. When rates are increased above a certain maximum, the public is apt to turn to competitors or so curtail their consumption that the net result is a loss rather than a gain to the utility.

The increases in rates, particularly to domestic consumers, were substantial. It is quite likely the increases represented what, in the judgment of appellant's management, were the maximum increases that the traffic would bear. And if this be true, appellant's

estimate of the income they would produce is nothing more or less than a forecast. There is nothing in the record to indicate that appellant was satisfied—or, for that matter, dissatisfied—with what the forecast of the future seemed to hold.

### RATE DIFFERENTIAL BETWEEN DOMESTIC AND COMMERCIAL CONSUMERS

Because the commission disallowed the increases in their entirety, the question of the validity of appellant's distribution of the increases, as between domestic and commercial consumers, was not directly before it and, therefore, not before this court. However, we think it would be well, in concluding this opinion, to point out we agree with much the commission said about the inequitable burden placed upon the domestic consumers.

### ORDER

To the extent herein indicated the order is reversed and the record is remanded for further proceedings in accordance with this opinion; each party to pay the cost of printing its own briefs, the cost of printing the record to be divided equally between appellant and the commission.

BALDRIGE and RENO, JJ., took no part in the consideration or decision of this case.

DISSENTING OPINION BY RHODES, J.:

I am unable to agree with the decision of the majority. There is no ground for appellant's averment of confiscation, and none has been shown. The commission has made a finding supported by the record as to the present fair value of appellant's property; I would sustain its order. But the majority opinion requires, in principle and in substance, the granting of appellant's basic demands; it limits the commission in determining fair value largely to the utility's present conception of that term—a fantastic figure upon which the rates must yield a "fair return."

Appellant has stated its position as follows:

"Unless there are different estimates of reproduction cost, or unless some part of the estimate is shown to be erroneous or inaccurate, the Commission must take the reproduction cost figure as shown by the evidence and give it weight in determining present fair value. To say that a reproduction cost estimate which is neither contradicted nor shown to be erroneous may be weighted, i. e., revised, in accordance with 'common sense,' is to refuse to consider the evidence as shown by the record . . . . . .

"The Commission should have found that the reproduction cost new less accrued depreciation of Respondent's property at December 31, 1938, was $57,695,275 (exclusive of working capital) (Ex. 24, R. 2465a) . . . . . .

"The Commission should have found the present fair value of Respondent's property, exclusive of working capital, at December 31, 1938, to be $57,695,275. (See Ex. 24, R. 2465a)." [1]

Appellant, in its brief, says: "Upon the evidence in the record, it is clear that the present fair value of the Company's property is not less than $40,000,000 and that the rate of return should approximate 7.8%."

Fair value as found by the commission, including $1,566,085 for working capital, is $21,566,085. At the rate of return allowed by the commission—6½ per cent—there is an annual allowable return of $1,401,796.

---

[1] The commission in its final order said: "In brief, respondent demands acceptance of its figures at face value, irrespective of whether they represent fact or opinion, and insists that, in fixing fair value, we must close our minds to all factual evidence and select that one figure, based exclusively upon opinion, which respondent selects. It is not surprising to find that this figure (depreciated reproduction cost) is the highest of all the rate base elements. The formula thus prescribed for us by respondent is clearly a formula for indirect but complete control by the utility of its own rates—the very antithesis of the regulatory concept." 3724a

Appellant demands at least $3,120,000. Appellant is wholly owned by the Standard Oil Company of New Jersey; the latter's investment as found by the commission is $12,744,126 (3563a). On appellant's theory there would be an annual return of nearly 22 per cent on this investment, plus $1,566,085 working capital. The commission's allowance produces a return of 9.79 per cent.

It is obvious the majority opinion insists that depreciated reproduction cost must be not only an element but the sole factor in the determination of fair value in this case. The result of the reasoning which again appears in the majority opinion has been to bring the regulatory process as it relates to rate-making into contempt. The majority opinion says that "the commission may use original cost as a base providing it makes proper adjustments for increases in prices," and that "the original cost figure used by the commission gave no consideration whatever to the uncontradicted evidence that, if the actual cost had been adjusted to reflect the price levels of December 31, 1938, it would have been approximately the same as reproduction cost." As to this the commission said: "We have not given material weight to respondent's evidence of trended original cost for the reason that it reflects no element of value necessary for consideration in arriving at the rate base. It is not the investment, the original cost, the cost to reproduce, the present value, or any other definitive element, but merely a calculation, labeled 'trended original cost' which respondent has offered of record for the purpose of indicating the weight to be given reproduction and original costs in arriving at fair value. 'Trended original cost' is neither cost nor value."

Although there is a statement in the majority opinion to the effect that the commission may not be bound on rehearing to find the present fair value approximates

$40,000,000, by process of elimination and by the charted course which the commission must pursue the result seems predetermined.

I am convinced that the evidence plainly warrants the ultimate findings and order of the commission. And, as I view it, the commission is not bound by every subordinate finding that it makes in such a case, and I do not understand that its finding as to reproduction cost—[2] merely indicative of estimates of appellant's witness—must under the law play the part, in the determination of its ultimate finding of fair value, assigned to it by the majority opinion. "There is no requirement that the commission specify the weight given to any item of evidence or fact or disclose mental operations by which its decisions are reached. Useful precision in respect of either would be impossible": *Baltimore & Ohio R. Co. v. United States,* 298 U. S. 349, at page 359, 80 L. Ed. 1209, at page 1219. "There is no principle of due process which requires the rate making body to base its decision as to value, or anything else, upon conjectural and unsatisfactory estimates": *Railroad Commission of California et al. v. Pacific Gas & Electric Co.,* 302 U. S. 388, at page 397, 82 L. Ed. 319, at page 325.

As said by the United States Supreme Court in *West Ohio Gas Co. v. Public Utilities Commission of Ohio (No. 1),* 294 U. S. 63, at page 70, 79 L. Ed. 761, at page 768: "Our inquiry in rate cases coming here from the state courts is whether the action of the state officials in the totality of its consequences is consistent with the enjoyment by the regulated utility of a revenue something higher than the line of confiscation. If this level is attained, and attained with suitable opportunity

---

[2] According to *Solar Electric Co. v. Pennsylvania Public ·Utility Commission et al.,* 137 Pa. Superior Ct. 325, 351, 9 A. 2d 447, it would seem that it was necessary for the commission to make a finding relative to reproduction cost, but it does not follow that the commission was obliged to accept the amount in its determination of fair value.

through evidence and argument (*Southern R. Co. v. Virginia,* 290 U. S. 190, 78 L. Ed. 260, 54 S. Ct. 148), to challenge the result, there is no denial of due process, though the proceeding is shot through with irregularity or error."

The assumption that only depreciated reproduction cost, or its equivalent, necessarily determines fair value in the present case is insupportable; moreover, this method would lead to absurd results. In the commission's order nisi and final order it is manifest that the relevant elements have been given due weight; and there has been adherence to the law as embodied in the appellate decisions of this state and of the United States Supreme Court. As to uniformity, see *Fidelity-Philadelphia Trust Co. v. Allen et al.,* 343 Pa. 428, 22 A. 2d 896. In its final order the commission said (3725a) : "We have not, either in our order or our thinking, ignored reproduction cost or other opinion figures as respondent alleges. We recognize reproduction cost, when properly determined, as an effort to reflect the impact of economic forces upon that intangible thing called value between the time the property was constructed and the present day. But we must also recognize that the reproduction cost is a very imperfect reflection." We said in *Solar Electric Co. v. Pennsylvania Public Utility Commission et al.,* 137 Pa. Superior Ct. 325, 347, that we had consistently followed the rule of *Smyth v. Ames,* 169 U. S. 466, 42 L. Ed. 819, in the valuation of the property of public utilities. As to the elements of value, *Smyth v. Ames,* 169 U. S. 466, at page 546, stated: "And in order to ascertain that value [fair value of the property being used by the utility for the public convenience], the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property

under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property."

In *Driscoll et al. v. Edison Light & Power Co.*, 307 U. S. 104, 83 L. Ed. 1134, the order of the Pennsylvania Public Utility Commission was upheld by the United States Supreme Court as the commission did not confine itself to one element, original cost less depreciation, in setting the fair value of the utility's property for the purpose of temporary rates, but gave weight to reproduction cost, original cost, going concern value, and the necessity for working capital.

But there is no requirement that the commission adopt any single formula or combination of formulas in determining fair value; and if the commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, it should be sustained. *Federal Power Commission v. Natural Gas Pipeline Co.*, 315 U. S. 575, 586, 86 L. Ed. 1037, 1049. The concurring opinion in the latter case goes on to say: "The rule of Smyth v. Ames [169 U. S. 466, 42 L. Ed. 819] as construed and applied, directs the rate-making body in forming its judgment as to 'fair value' to take into consideration various elements—capitalization, book cost, actual cost, prudent investment, reproduction cost ...... But as stated by Mr. Justice BRANDEIS [262 U. S. 295, 296, 67 L. Ed. 988, 989]: 'Obviously "value" cannot be a composite of all these elements. Nor can it be arrived at on all these bases. They are very different; and must, when applied in a particular case, lead to widely different results. The rule of Smyth v. Ames, as interpreted and applied, means merely that all must be considered. What, if any, weight shall be given to any one, must practically

rest in the judicial discretion of the tribunal which makes the determination.' ...... The havoc raised by insistence on reproduction cost is now a matter of historical record ...... As we read the opinion of the Court, the Commission is now freed from the compulsion of admitting evidence on reproduction cost or of giving any weight to that element of 'fair value' ": *Federal Power Commission v. Natural Gas Pipeline Co.,* supra, 315 U. S. 575, at pages 604, 605, 606, 86 L. Ed. 1037, at pages 1059, 1060. See, also, "Does The Ghost of Smyth v. Ames Still Walk?" by Robert L. Hale, 55 Harvard Law Review 1116, 1140, May, 1942.

In *Solar Electric Co. v. Pennsylvania Public Utility Commission et al.,* supra, 137 Pa. Superior Ct. 325, 364, 9 A. 2d 447, 469, this court in making its own determination of fair value said that its "independent judgment" was exercised "after considering the character of respondent's plant, the book cost of invested capital as shown on the company's books, the reproduction cost new and the accrued depreciation."

There is no purpose in sending this case back to the commission; if we have sufficient reason to disagree with the commission on the fundamentals, we should determine the facts and terminate this litigation. See *Solar Electric Co. v. Pennsylvania Public Utility Commission et al.,* supra, 137 Pa. Superior Ct. 325, 353, 354, 9 A. 2d 447. It has been going on for years, and we should proceed to end it. Appellant very properly suggested such final action by this court upon its own independent judgment as to both the law and the facts. Otherwise by protracted litigation the commission may be worn down and the patience and resources of the public exhausted. The advantage of prolonged litigation lies with the party able to bear heavy expenses. *Crowell v. Benson,* 285 U. S. 22, 94, 76 L. Ed. 598, 637. Usually, in rate cases, the public eventually pays the utility's litigation expense. But the commission's order

appeals to me as being eminently fair to appellant and to its owner, the Standard Oil Company of New Jersey; and as applied to the facts the order certainly produces no arbitrary result.

In 1939, during the pendency of the commission's inquiry into then existing rates, appellant filed its tariff No. 19, which provided for increased rates. These new rates, effective July 1, 1940, are now in effect. The commission, by its order, has allowed $1,401,796 annually for return in addition to taxes, annual depreciation, and all other operating expenses. Notwithstanding what is said in the majority opinion, it is a matter for observation and comment that this allowable return is nearly double appellant's expected return of $708,295.04. There was, as stated by the commission, no restriction whatever upon appellant when it calculated its own proposed increased rates, and therefore it is reasonable to assume it calculated the rates to produce an acceptable annual return. On a 7.8 per cent rate of return now claimed by appellant we would have a rate base of $9,081,989 to produce the net income of $708,295.04. This return anticipated by appellant under tariff No. 19 represents only 1.77 per cent of appellant's presently claimed minimum fair value of $40,000,000. It is significant that the commission's allowable return presents the following results when applied to the stated bases, each of which includes $1,566,085 for working capital:

|  | Base |  |
|---|---|---|
| 1. Fair value as found by the Commission | $21,566,085 | 6.50% |
| 2. Total invested capital [3] ($12,744,126) | 14,310,211 | 9.79% |

[3] "Although we will not consider invested capital as being a direct factor in fair value determination, it does perform a very important function by showing us at what point a fair value finding would work a hardship upon respondent's owners." Order nisi, 3581a.

| | | |
|---|---|---|
| 3. Capital stock ($13,200,000) | 14,766,085 | 9.49% |
| 4. Book cost ($39,283,989) less reserves for depreciation ($29,414,196) [4]—($9,869,793) | 11,435,878 | 12.25% |
| 5. Depreciated original cost ($22,095,839) ............ | 23,762,924 | 5.89% |
| 6. Depreciated reproduction cost ($35,573,183) ......... | 37,139,268 | 3.77% |

Moreover, the return allowable by the commission is nearly $400,000 in excess of appellant's average net earnings for the ten-year period which ended December 31, 1939, and if we adopt appellant's consolidated earnings computation the average net earnings for the years 1932-1939, inclusive, are almost $600,000 below the commission's return allowance.

If, under this state of affairs, the commission is impotent to act to produce a result fair and reasonable to both investor and consumer in a rate case, unwanted and unnecessary solutions of such regulatory problems may eventually follow.[5]

---

[4] "It is sometimes said, and usually correctly, that assets represented by the depreciation reserve are plant assets. Such assets belong to the utility and, if used and useful in the public service, they are properly includible in the rate base. When it is argued that the depreciation reserve should be deducted in computing the rate base, it is not argued that the assets which it represents should be excluded from the base. It is argued, merely, that the depreciation reserve, when properly computed, represents, the actual depreciation in those properties which are included in the base ......

"The deduction of the depreciation reserve, or its equivalent, obviates all harmful inconsistencies. The depreciation reserve shows the results to date of the effective depreciation factors. It harmonizes depreciation expense and actual existing depreciation": Report of Committee on Depreciation, National Association of Railroad and Utilities Commissioners, 1943, pp. 168, 169.

[5] If anyone has reason to complain it is the domestic consumer whose rate for gas has been increased from 63 cents to $1.45 for the first 1,000 cubic feet. Any schedule of rates should be made nondiscriminatory before approval.

In *Dayton Power & Light Co. v. Public Utilities Commission of Ohio*, 292 U. S. 290, at pages 311, 312, 78 L. Ed. 1267, at pages 1281, 1282, the United States Supreme Court, in an opinion by Justice CARDOZO, said: "Under the earlier schedule the revenue was even less ...... the valuations [submitted by the utility] are discredited by the teachings of experience. Men do not transact business without protest at confiscatory rates, at all events in the absence of extraordinary circumstances making submission to the loss expedient. If such circumstances exist, the appellant has not proved them. Nothing in the record lays the basis for a belief that the natural gas business ...... is unable to pay its way. That being so, what the public utility has done belies what it has said. We shall hardly go astray if we prefer the test of conduct."

The commission based its accrued depreciation [6] upon straight line age-life computations made by its technical staff on the basis of record evidence and in accordance with the expression of this court in *Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 141 Pa. Superior Ct. 5, 14 A. 2d 133. We there said (page 14): "If the commission was of opinion that the theoretical age-life method was preferable, there was nothing to prevent it from making, through its bureaus, its own estimate of accrued and annual depreciation." See, also, *Scranton-Spring Brook Water Service Co. et al. v. Public Service Commission*, 119 Pa. Superior Ct. 117, 181 A. 77.

I think the expensed items were properly excluded from the rate base.[7] I agree with the holding in *City of*

---

[6] During 1908 the depreciation reserve of $2,840,006.20 was transferred to surplus which was thus increased to $5,993,134.46. Dividends were then paid in the amount of $5,440,000. The commission made no adjustment for this.

[7] The commission included the disputed amount in original cost. The question is whether or not the commission properly gave consideration in fair value determination to the choice by

*Wheeling v. Natural Gas Co. of West Virginia,* 175 S. E. 339, to the effect that where consumers, due to bookkeeping methods, have paid for items of alleged capital under the guise of operating expenses, deduction should be made for such items in determining the fair value of the utility's property for rate making purposes. "It seems clear that it is not proper to build up operating expenses and get the advantage of a rate authorized to cover them, and later change the method of accounting to include such excess items as a part of the investment of the company, when, in reality, the money has been furnished by the customers of the company": *Peoples Gas Light & Coke Co. v. Slattery et al.,* 373 Ill. 31, 25 N. E. 2d 482, at page 493. See, also, *Federal Power Commission v. Natural Gas Pipeline Co.,* supra, 315 U. S. 575, 590, 591; dissenting opinion in *Hope Natural Gas Co. v. Federal Power Commission et al.,* 134 F. 2d 287, 312.

The other matters, including depreciation,[8] to which reference is made in the majority opinion, require no discussion, as they have been fully considered in the commission's reports and orders, and no substantial error has been disclosed. The question now raised by appellant as to refunds was not raised before the commission, nor is this alleged error specifically assigned. Appellant not having been deprived of either opportunity, the commission should not be reversed on this ground now.

---

appellant's management that the consumers should reimburse the utility immediately rather than through depreciation accruals. See, also, order nisi, 3580a.

[8] In a recent publication—"Report of Committee on Depreciation, National Association of Railroad and Utilities Commissioners, 1943"—is found an exhaustive and pertinent discussion of the subject of depreciation in public utility regulation. It appears that representatives of leading utility organizations assisted the committee in the collection of data and were afforded an opportunity for advance review of and comment on the tentative draft of the report.

The commission's order is a well-considered determination of a complex problem; it constitutes a reasonable judgment based on a consideration of the relevant facts.

The commission's order should be affirmed.

CONCURRING OPINION BY KELLER, P. J.:

The majority opinion has properly emphasized what we decided in *Solar Electric Co. v. P. U. Comm.*, 137 Pa. Superior Ct. 325, 335-6, 9 A. 2d 447, viz., that in fixing the rate base of a utility the *fair value* of its property used and useful in the public service "is the thing which this commission and its predecessor were authorized by the legislature to ascertain". See Sec. 20 of Art. V of the Public Service Company Law of July 26, 1913, P. L. 1374, and sec. 311 of Art. III of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1151, headed, "Valuation of Property of a Public Utility".

Notwithstanding the clear expression of our views in that case, which the commission, under the law, was required to follow until it was changed by this court, or reversed by our Supreme Court, the dissenting commissioner below refused to accept our construction of the Public Utility Law and, instead of Fair Value, insisted on using Book Cost less Depreciation Reserve as the rate base. This was in consequence of his erroneous conclusion that Section 310 of the Public Utility Law, relating to "Temporary Rates", which the commission was authorized to establish pending the final determination of the rate proceeding, and which provided that the temporary rates so fixed should "be sufficient to provide a return of not less than five per centum upon the original cost, less accrued depreciation, of the physical property (when first devoted to public use) of such public utility used and useful in the public service", furnished the rule to be applied in determining the rate base. If the legislature had meant this to be the meas-

ure of valuation in the final determination of a rate proceeding, it would have said so instead of prescribing "the fair value of ...... the property of [the] public utility", as it did in the next section (311). It was only a temporary expedient—see Sec. 310(e) permitting the utility to amortize and recover the difference between the temporary rates and the rates as finally determined. And as pointed out in the majority opinion of this court, the constitutionality of section 310 has not been established by any decision of this court or of the Supreme Court of Pennsylvania, or by the Supreme Court of the United States. Its constitutionality did not come before the Supreme Court of the United States in *Driscoll v. Edison Co.*, 307 U. S. 104, because, as there pointed out by Mr. Justice REED, the commission in fixing the temporary rates in that case had not strictly followed the rule laid down in section 310, but had also considered other matters proper to be considered in finally determining the rates. He said (p. 113) "The argument seems to be that a statute which permits an unconstitutional determination is invalid, even though it is actually applied in a constitutional manner ...... as the district court had stated that compliance with *Smyth v. Ames*, [169 U. S. 466] was necessary in temporary rate making, the commission based the order now under review on evidence requisite under that rule. By taking this position, it interprets the statute as requiring consideration of elements other than original cost in fixing temporary rates."

While the commission did not adopt the view advanced by the dissenting commissioner, it, nevertheless, considered 'Book cost less depreciation reserve' as one of the elements proper for consideration in arriving at the rate base. The majority opinion in this court demonstrates that it has no place in such consideration and should be entirely disregarded in determining the rate base.

The dissenting opinion in this court, while not acceding to nor adopting the view of the dissenting commissioner, has nevertheless calculated the percentage of annual return that the commission's allowable income would give the utility, based on 'Book cost less depreciation reserve', plus working capital, ($9,869,793+$1,566,085) to be 12.25 per cent. In view of the fact that this calculation leaves out of consideration some $29,400,000, *invested in the property of the utility,* but carried on its books as Depreciation Reserve, I think it advisable that some further explanation of the nature of a Depreciation Reserve should be given.

Depreciation reserves are amounts set apart annually from income for the purpose of replacing the utility's property when worn out or discarded at the end of its useful life. The figure is calculated by ascertaining the amount which invested in good, safe securities, with the interest added annually, will be reasonably sufficient to replace the worn out plant, when its usefulness is over.

Expressed, from another point of view, "Depreciation is the loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy and obsolescence ...... By [the 'straight line' method of computation], the annual depreciation charge is obtained by dividing the estimated service value by the number of years of estimated service life. The method is designed to spread evenly over the service life of the property the loss which is realized when the property is ultimately retired from service". HUGHES, C. J., in *Lindheimer v. Illinois Bell Telephone Co.,* 292 U. S. 151, 167, 168.

If the utility is a single structure, such as a concrete bridge, which does not call for enlargement or expansion, these annual depreciation reserves could be invested in government bonds, and the interest re-invested as it accrued, during the useful life of the bridge, and

then, if like the Deacon's One-Hoss Shay, it went to pieces all at once, it could be replaced with a new bridge, out of the depreciation reserves, unless prices had materially increased by that time. In such case the reserve would be kept separate from the other moneys of the company and the interest received from it would be ear-marked and would not enter into the ordinary receipts and disbursements of the Company. But such an arrangement is not feasible for most utilities. Certainly not for one like this appellant with a plant consisting of many different items, with different life expectancies.

Consequently, in actual practice, these reserves for depreciation—especially as to items not replaceable for years—are often used in the enlargement and expansion and improvement of the utility, to the relief of additional capital expenditures; and they are entitled to have allocated to them their proportionate share of the income earned on the money so invested just as if the expansion and improvements had been paid for out of new capital raised by additional stock or bonds.

To say that such reserves are to be excluded from participating in the earnings to the extent that they have been invested in, and are now assets forming a part of, the used and useful property of the plant, would be to deprive the depreciation reserve of the income necessary to produce the amount required to replace the plant when its useful life is over.

In *Clark's Ferry Bridge Co. v. P. S. Comm.*, 291 U. S. 227, which affirmed the judgment of this court (108 Pa. Superior Ct. 49, 165 A. 261), Chief Justice Hughes, speaking for the court, with reference to the depreciation reserve of a concrete bridge, said:

"There is no question as to the fact of depreciation. It was established, as respondent admits, that concrete bridges deteriorate from the moment of their completion; that there are chemical changes in their structure,

absorptions of moisture and oxidation, both within the concrete and in the reenforcing iron covered by it, which cannot be stopped in their process or their effects removed. With this understanding, the question is as to the amount which should annually be allowed which will serve adequately to protect the investment from impairment due to age and use. Testimony was given by one of appellant's engineers that the average life of a concrete bridge was from 30 to 50 years; ...... The Commission's engineer estimated its life at from 40 to 50 years; for his computation he took an expectancy of 45 years. Respondent urges that the annual allowance asked by appellant was plainly too large and contrasts it with appellant's claim for accrued depreciation ...... While it is recognized that accrued depreciation, as it may be observed and estimated at a given time, and an appropriate allowance of depreciation according to good accounting practice, need not be the same, there is no rule which requires an allowance to be made or continued which in the light of experience is shown to be extravagant ...... After reviewing the testimony, and the methods of calculation which the parties respectively advocated, the court [that is, this Court—see 108 Pa. Superior Ct. pp. 77, 78] thus stated its conclusion: "It [the Commission] allowed $7,678 annually. This sum set aside each year, with 4% *simple* interest will in fifty years produce approximately $767,800, sufficient to rebuild the bridge as now valued. The straight line method advocated by the Company will in fifty years with 4% simple interest produce a fund twice as great as that necessary to replace the bridge. The straight line method is often used for short-lived structures, or plants of a character that they can be restored from time to time to the original condition of efficiency ...... It is not so fair or equitable when applied to a long-lived structure or one that is disintegrating gradually and continuously and not capable of being restored

to its original condition. The company may not be required to apply the income received from the depreciation fund to make up any deficit of operation (*Board of Public Utility Comm'rs v. New York Telephone Co.*, 271 U. S. 23), but it is not entitled to an allowance, which *exclusive of interest* earned on the fund, will be sufficient to rebuild the bridge, when its life is done, but only to such an allowance as will *with reasonable interest added* make a fund sufficient to replace the bridge when it requires replacement.' " (Italics supplied).

This principle was recognized in the Report of Committee on Depreciation, National Association of Railroad and Utilities Commissioners, 1943, cited in a note to the dissenting opinion in this court, which report, on page 168, says:

"It is sometimes said, and usually correctly, that assets represented by the depreciation reserve are plant assets. Such assets belong to the utility and, if used and useful in the public service, they are properly includible in the rate base. When it is argued that the depreciation reserve should be deducted in computing the rate base, it is not argued that the assets which it represents should be excluded from the base. It is argued, merely, that the depreciation reserve, when properly computed, represents the actual depreciation in those properties which are included in the base."

It is the fair value of the property of the utility, used and useful in the public service, which is the base to be used in determining what the utility is entitled to receive in a rate proceeding; not such property deprived of the assets purchased out of the funds of the company carried on its books as depreciation reserve.

The unfairness of a calculation based on such an exclusion of the utility's assets is best shown by a concrete example: If a utility has property used and useful in the public service, reasonably valued at thirty

million dollars, with a depreciation reserve on its books of twenty-one million dollars invested in the plant, and its annual net income is $1,500,000, the rate of return is 5% — (that is, $\frac{1,500,000}{30,000,000}$ not 16 2/3%, $\frac{1,500,000}{9,000,000}$). The same principle applies where earnings are not paid out in dividends but are plowed back into the expansion and improvement of the company's plant, and the earnings are thus, in effect, compounded. See *Solar Electric Co. v. Penna. P. U. Comm.*, 137 Pa. Superior Ct. 325, pp. 352-3, 9 A. 2d 447.